Filed 7/16/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>BRIAN COLE FIORE,<br><br>        Defendant and Appellant. | A136116<br><br>(Humboldt County<br>Super. Ct. No. CR092553S) |

Defendant Brian Fiore drove his friend, David Fields, from the Bay Area to Humboldt County so Fields could buy a large quantity of marijuana. Instead of buying the marijuana, Fields stole it at gunpoint, and Fiore drove him away in Fiore's Jeep. A chase ensued, and multiple shots were fired at law-enforcement officers from the Jeep. The officers did not fire back. The pursuit ended when the Jeep hit a spike strip and drove over an embankment. Fields was found dead with a gunshot wound in the head. Fiore was found with a self-inflicted gunshot wound in the head, and he survived.

1

Fiore was charged with multiple offenses, and a jury convicted him of some but not others. He was convicted of one count of second degree murder of Fields[1] and an accompanying enhancement of personal and intentional discharge of a firearm resulting in great bodily injury or death;[2] two counts of attempted murder, with one accompanied by an enhancement of personal and intentional discharge of a firearm; and two counts of first degree robbery.[3] The jury was unable to return verdicts on three other counts of attempted murder, one count of first degree burglary, and one count of resisting an executive officer and accompanying enhancements, and these counts were dismissed. It

_____

[1] The verdict form for the murder count and the pronouncement of that verdict referred to Penal Code section 187, subdivision (a) without identifying the degree of murder. The jury was instructed, however, that it could find Fiore guilty only of second degree murder, and it could do so either under Penal Code section 187 on a theory of malice murder or under Penal Code section 189 on a theory of felony murder with robbery as the underlying felony. Thus, "giving effect to the manifest intention of the jury," the conviction was necessarily for second degree murder. (*People v. Escarcega* (1969) 273 Cal.App.2d 853, 858.) Although felony murder is *first* degree murder when the underlying felony is robbery (see Pen. Code, § 189), neither party takes issue with the jury's having been instructed on *second* degree murder as to that theory. All further statutory references are to the Penal Code unless otherwise noted.

[2] The personal-discharge enhancement for the murder count was brought under section 12022.53, subdivision (d).

[3] The attempted murder convictions were under sections 187, subdivision (a) and 664, subdivision (e). The robbery convictions were under section 211. The personal-discharge enhancement for one of the attempted murder counts was under section 12022.53, subdivision (c). Fiore was also convicted of several other crimes that are not directly at issue here: one count of evading an officer (Veh. Code, § 2800.2, subd. (a)); one count of sale or transportation of marijuana (Health & Saf. Code, § 11360, subd. (a)) with an accompanying enhancement of personal use of a firearm (§ 12022.5, subd. (a)); one count of transportation of an unlawful assault weapon (former § 12280, subd. (a)(1), now § 30600, subd. (a)); and one count of shooting at an occupied motor vehicle (§ 246).

2

was also unable to return a verdict on an allegation of personal use of a firearm that accompanied both robbery counts.[4]

Fiore was sentenced to a total of 68 years and eight months to life, plus three additional life sentences. The sentence included a term of 15 years to life for the murder, plus a consecutive term of 25 years to life for the enhancement of personal and intentional discharge of a firearm; a life sentence for both attempted murders, plus a consecutive term of 20 years for one of them based on the personal-discharge enhancement; a term of six years for the first robbery count; a term of two years for the second robbery count; and a term of eight months for evading an officer. The trial court stayed the sentences for the remaining counts.

On appeal, Fiore argues that the trial court erred by (1) failing to instruct the jury that duress is a defense to felony murder; (2) improperly instructing the jury on the intent necessary to establish an aider and abettor's liability for robbery; and (3) permitting lay opinion testimony that there was "possible brain tissue and bone matter" on the inside of the Jeep's front passenger-side door. He also claims that there was insufficient evidence to support his second robbery conviction and that his convictions should be reversed for cumulative error. We agree that the second robbery conviction must be reversed, but we otherwise reject Fiore's claims and affirm the judgment.

---

[4] The attempted murder counts were brought under sections 187, subdivision (a) and 664, subdivision (e). The burglary count was brought under section 459, and the accompanying enhancement of personal use of a firearm was brought under section 12022.5, subdivision (a). The count of resisting an executive officer was brought under section 69, and the accompanying enhancement of personal use of a firearm was brought under section 12022.5, subdivision (a). The enhancement of personal use of a firearm accompanying both robbery counts was brought under section 12022.53, subdivision (b).

# I.
## FACTS

### A.     *The Robbery.*

Fiore, age 19, met Fields at a party in early 2009.  About a week later, Fiore approached Fields to buy marijuana for personal use.  The two men began spending a lot of time together, and Fiore considered Fields a good friend.  Fields did not have a car, so Fiore drove him around the Bay Area in Fiore's Jeep Cherokee in exchange for gas money, marijuana, food, and clothes.  Fiore also drove Fields to Humboldt County so Fields could visit his fiancée, Kyrie Slade, and buy marijuana.

Fields sold marijuana he bought in Humboldt County to customers in the Bay Area, usually in Richmond or Vallejo, and Fiore often accompanied him.  Fiore believed that many of Fields's customers looked like gang members, and these customers often displayed weapons.  Fields usually carried a Glock .45 pistol.  Fiore wore a bulletproof vest when he accompanied Fields to these drug sales because he did not like carrying a gun, although he had done so on a few occasions.  Fiore wore the vest "pretty much all the time when [he and Fields] were . . . doing drop[-]offs, pick[]ups, transactions" involving marijuana because it gave him "peace of mind."

On May 11, 2009, Fiore drove Fields around the Bay Area so Fields could collect money to buy marijuana in Humboldt County.  This Humboldt deal had come about through Chris Gault, who introduced Fields to the seller, Anthony Young.  Fields and Young agreed that Young would sell Fields 20 pounds of marijuana.  After several stops, Fiore and Fields drove north and arrived at the Eureka home of a friend of Slade's.

Slade and her friend were there, and after "hanging out" with them for a while, the men left.  After they got in the Jeep, Fields took the Glock from underneath the front passenger's seat and put it in his waistband.  Over the phone, Gault directed them to Young's house in McKinleyville.  They parked across the street from the house, and Gault and Young came out to meet them.  When Young asked Fields "if he had the money," Fields opened his backpack, and all four men went inside the house.

4

Accounts of who was at the house differed. Fiore testified that there were several other people at the house, including Young's brother; Juan Montez, a close friend of Gault's; Jason Hatfield, whom Gault and Montez also knew; and at least one woman. Fiore believed that other people present whom he could not identify owned the marijuana and were there to make sure they got their money. Montez, who arrived at the house with Gault shortly before Fiore and Fields arrived, testified that Young, Young's brother, Hatfield, and an unidentified woman and man were there. According to Gault, only he, Montez, Young, Fields, Fiore, and Hatfield were present.[5]

Young, Gault, Fields, and Fiore went into the kitchen, where the marijuana was in a duffle bag and a Rubbermaid tub. Young said he had been able to amass only 14 pounds of the drug. Fields and Fiore were offered and accepted two blunts (marijuana cigars) so they could sample the marijuana, and the men socialized. Meanwhile, Montez and Hatfield were in the living room on a couch.

Gault testified that several minutes after Fiore and Fields arrived, Fields said, "I need to make a call and make sure this is okay, that we can go through with it." Fields left the house and soon returned holding a sawed-off AK-47 rifle.[6] Gault turned to see Fiore holding a "black pistol" three inches from Gault's face. According to Gault, Fiore told him, "I am going to kill you if you don't get on the ground. I will [f]'ing blow your head off." Gault obeyed. Fiore then pointed the gun at Hatfield and Montez and said, "Stay the fuck there. Stay right there . . . . Don't move. Don't move," but Hatfield managed to run outside. Fields put the AK-47 by Gault's face and said, "Can you see the bullet? Can you see the bullet? This is your last three seconds of life." Gault said, "Man, just leave. Just take what you want and leave." He described the robbery as "a

---

[5] Gault testified under a grant of transactional and use immunity. Aside from Fiore, Gault and Montez were the only people present at Young's house who testified at Fiore's trial.

[6] Fiore had seen Fields with what he believed to be the same gun once before, when the men used it for target practice in a rural area.

well[-]oiled machine . . . . [T]hey knew what to do." Montez generally corroborated Gault's testimony, although he testified that Fiore's pistol was "a silver-ish color."

Fiore told a different story about what happened in the house, and he denied having used a gun. He testified that he was in the kitchen, talking to Gault, and did not notice that Fields had left. He then heard someone yell, "Get the fuck on the ground. Get the fuck on the ground." He turned and saw the barrel of an AK-47 sticking through the sliding glass door to the living room. Fields was "swinging [the gun] around" as the other people began getting on the ground. Fiore testified that he "froze up" and did not immediately understand what was happening because he and Fields had not planned it. Fields then told Fiore to take the marijuana. Fiore grabbed the duffel bag and the tub and began dragging them out, but he had to go back because he forgot his keys on the kitchen counter. Fiore then "backpedal[ed]" out of the house, dragging the bag and the tub along the floor. Once outside, he put the bag and tub in the Jeep's rear cargo area.

According to Gault, after Fiore took the marijuana and left the house, Fields "held [the remaining people] at gunpoint for about two minutes," threatening to kill them if they moved. Gault heard a car honk, and Fields ran outside. Gault then "heard them screech off." He thought he heard gunshots as Fields and Fiore drove away but was not sure because he "was completely terrified at that point." "[W]ithin 30 seconds," Young called 911 and reported that shots had been fired.[7]

Fiore, who could not recall honking the Jeep's horn, saw Fields exit the house as he was starting the car. Fields got into the Jeep and put the AK-47 between his legs. He seemed to be agitated and "on . . . an adrenalin[e] rush." At Fields's direction, Fiore got on Highway 101 and headed south.

---

[7] Whether shots were actually fired was uncertain. Gault acknowledged that he was the only one in the house who heard gunshots. Fiore testified that no shots were fired, and no physical evidence was ever recovered near Young's house to suggest that they were. Gault also acknowledged that in his initial interviews with law-enforcement officers he lied about other details of the robbery. At trial, he attributed this lying to his fear of Young.

*B.     The Chase.*

Fiore testified that as they were driving, he asked Fields, "Hey, what the fuck was that?" Fields "started getting paranoid" and told Fiore, "You better not rat on me. I know where you live." Fields also threatened Fiore's family. Fiore promised not to tell anyone about the robbery and said, "Where do you want to go? Wherever you want [to] go, I will take you. But after that, me and you, we're done." Despite Fiore's assurances, Fields "was still paranoid." He directed Fiore onto Highway 299 headed east.

After they got on Highway 299, Fiore noticed a patrol car behind them. Fields told him to keep driving if its sirens were turned on. When Fiore said he was going to pull over, Fields said, "No, you're not." Fields, who was right-handed, then pulled out the Glock, aimed it at Fiore's chest, and said, "If you try to pull over, I am going to shoot you." Fiore began to "plead" with Fields, telling him, "I don't want to do this, dude. Come on, dude, just let me pull over." Fields put the pistol to Fiore's temple and said, "Shut the fuck up. If you don't do what I say, I am going to put a bullet in you." Fiore said, "All right. Hey, all right. Just drop the gun," and Fields did. About a minute later, the patrol car's sirens were turned on.

The patrol car was driven by Deputy Braden Brawner of the Humboldt County Sheriff's Office. At about 10:45 p.m., Deputy Brawner had heard a broadcast that "a gold Jeep Grand Cherokee had fired several shots from an AK[-]47." Soon after, another broadcast stated that "a gold Jeep Cherokee had been seen . . . and the occupants were waiving [*sic*] a firearm out the window." Deputy Brawner, who was patrolling Highway 299, began driving west toward Highway 101. Within minutes, a gold Jeep Grand Cherokee passed him going east, and he turned around to go after it. He checked the Jeep's license plate and learned that it was registered to a person with the last name of Fiore. Deputy Brawner decided to wait until backup arrived to pull the Jeep over.

Deputy Brawner described the relevant stretch of Highway 299 as winding "with some sharp turns at points; and either side of the roadway in many places has steep drop-offs, steep embankments that lead down to the [Trinity River] below." The number of

lanes in each direction varies throughout. Conditions at the time were clear, but there was little lighting along the road. Traffic was sparse.

Soon after Deputy Brawner started following the Jeep, Deputy Chance Landreneaux pulled in behind him, and Deputy Joseph Conlin pulled in behind Deputy Landreneaux. Deputy Landreneaux decided to stop the Jeep at milepost 12, a point where the road widened and was straight. After the three deputies turned on their overhead lights, the Jeep's speed increased to 75 to 80 miles per hour. The deputies activated their cars' sirens and gave chase.

Fiore testified that after the Jeep was "lit up" by the law-enforcement vehicles, Fields turned around and kneeled on the passenger's seat, aimed the AK-47 out the rear cargo window, and fired a shot. The window did not break. Fields then crawled into the back seat and fired a few more shots at the window, and "it exploded, and it came over [Fiore] like somebody just poured a bucket of glass on [him]." Deputy Brawner, however, testified that he never saw gunshots coming from the Jeep's rear cargo area and never saw the back window break. The other deputies agreed that they never saw the Jeep's back window break.

Around milepost 17, Deputy Brawner heard "approximately two to four loud pops . . . and saw flashes of light which [he] determined [were] . . . muzzle flash[es]" from the Jeep's passenger side. He could not see how many people were in the Jeep because its windows were tinted. Deputy Landreneaux testified that the first shots fired were at milepost 19.5. He heard three quick "popping sounds" and saw a muzzle flash from the passenger side of the Jeep. Deputy Conlin also saw a muzzle flash and testified that he heard two to four gunshots that sounded like they came from an "automatic weapon."

Deputy Conan Moore was headed westbound on Highway 299 when he heard a broadcast that Deputy Brawner was chasing the Jeep. Deputy Landreneaux directed Deputy Moore by radio to pull off the road and turn off his car's lights so that the Jeep's occupants would not shoot at him as they passed. Deputy Moore parked perpendicular to the road, directly facing it. As the Jeep passed him, at around milepost 21.6, he heard

8

four "rapid" gunshots that sounded like they came from "an automatic weapon." He "saw the . . . passenger of the vehicle hanging out the front passenger window of the vehicle" with "what appeared to be a rifle or automatic weapon in his hand" that was pointed "[t]o the rear of the vehicle." The man appeared to be pulling the trigger with his right hand. Deputy Moore activated his lights and siren and pulled in behind Deputy Conlin's car to join the chase.

The deputies testified that groups of two or more gunshots came from the Jeep's passenger side at several other points. Based on Deputy Landreneaux's reports to dispatch, shots were also fired from the Jeep around mileposts 19, 21, 23, 26, 27, and 35. Deputy Brawner believed there had been "at least two or three more volleys of gunfire" not reflected in that list. The deputies agreed that the shots tended to occur as the vehicles went around curves to the right. Throughout the chase, the Jeep generally stayed in its lane, although it swerved into the opposite lane several times in order to pass other vehicles. Deputy Landreneaux testified that in his opinion, based on the control with which the Jeep was driven, it would have been "impossible" for the driver to have been the one firing out of the passenger side.

Fiore testified that he "kind of went within [him]self" and could not remember portions of the chase. He recalled that Fields shot at the law-enforcement vehicles from the back seat and possibly from the rear cargo area, but he never saw Fields lean out of either passenger-side window. Fields was yelling that he was going to kill the deputies. Fiore and Fields were not talking to each other, and Fiore had become convinced that Fields was going to kill him. Fiore considered jumping out of the Jeep, but he was worried one of the pursuing cars would run over him. He believed that if he stopped the Jeep, Fields would kill him "and probably would [shoot] at least one officer."

Slade testified that she received a telephone call from Fields during the chase. According to Slade, "he was very hyped-up and scared and screaming," and he told her, "Babe, we are in a high speed chase. This is it." When she asked what he meant, he said, "I am not going to prison again. Kiss my son for me. I love you." She "heard him screaming at [Fiore], telling him to drive, and . . . cussing." She also heard Fiore

9

swearing, and he sounded scared as well. It then sounded like Fields put the phone down, and she heard gunshots. Fields did not speak to her again, and after a few minutes she hung up.

C. *The End of the Chase.*

Meanwhile, the deputies had requested help from the California Highway Patrol (CHP). The plan was for CHP Officer Eric Nelson to place a spike strip on the road to stop the Jeep before it reached the town of Willow Creek. Officer Nelson decided to place the strip at milepost 35.88. He parked his car on the south side of the road, facing west, and turned on his lights, which he hoped would distract the Jeep's driver enough to prevent the spike strip from being noticed.

Before Officer Nelson could place the spike strip on the road, he was surprised to see an SUV driven by CHP Officer Michael Noland drive past him headed west. Officer Noland, who had been wrongly informed that the chase was already over, passed Officer Nelson and pulled his vehicle into a turnout on the north side of the road, also facing west. Less than 30 seconds after Officer Noland passed Officer Nelson, Deputy Landreneaux radioed that the chase was approaching Officer Nelson's location. Officer Nelson placed the spike strip in the middle of the road and "well in front of" his vehicle, where he believed the Jeep's driver would not be expecting it.

Officer Noland saw a vehicle approaching, but he did not realize that it was part of the chase until it had almost reached him. He quickly leaned toward the passenger seat and heard "what sounded like four gunshots and a tire popping." According to Deputies Brawner and Landreneaux, a few rounds were fired from the Jeep as it passed Officer Noland's vehicle, which was on the Jeep's driver's side. Deputy Landreneaux testified that the shots sounded "more like a pistol being fired" and not like "the crisp pop of a rifle." Deputy Moore testified that the shots sounded like they came from "possibly a semi-automatic rifle," with pauses in between. He also saw muzzle flashes from the driver's side of the Jeep.

A few seconds later, Officer Nelson heard five to seven shots "much louder and much more close." Deputies Brawner, Landreneaux, and Moore also heard many shots,

10

which sounded like the previous shots from "the automatic weapon," as the Jeep passed Officer Nelson's vehicle. Officer Nelson was holding the spike strip's leash. He felt the Jeep go over the strip and quickly pulled it out of the road so that the pursuing vehicles would not run over it.

In contrast to the law-enforcement officers' testimony, which tended to suggest the Jeep's driver fired the Glock at Officer Noland, Fiore testified that Fields fired those shots. According to Fiore, as the Jeep passed Officer Noland's vehicle, he felt a "concussive force" that felt "different" from the one from the AK-47 and "felt a different window break and the glass come over [him] again," which he believed was the left rear window. Fiore had seen Fields put down the AK-47 and reach for his waistband, although he did not actually see Fields draw the Glock. Fiore testified that Fields returned to the rear cargo area after shooting at Officer Noland's vehicle, and shot at Officer Nelson's vehicle about five or six seconds later.

Fiore testified that after he drove over the spike strip, he told Fields, who was still in the rear cargo area, "Hey[,] it's game over, dude. The car is done." Fields responded that "it [isn't] over until [I say] it's over," which Fiore interpreted as a threat to kill him if he stopped the Jeep. Fiore saw the Glock resting on the back seat. He decided to shoot himself with it: "I made up . . . my mind, I am not going to let [Fields] kill me. If I get the chance, I will take my own life . . . . [¶] . . . [¶] . . . I felt like I had no control over my life. My life was in this guy's hands. He is threatening me . . . . [T]o me it was like a last positive thing I could do. I was taking back control of my life."

*D.      The Crash.*

After traveling over the spike strip, the Jeep slowed to about 50 miles per hour but continued to drive normally for about half a mile.[8] At a point where the road made a wide curve to the right, the Jeep continued traveling straight and crossed the westbound lane into a turnout at milepost 36.5. Without braking, the Jeep hit a three- to four-foot-

---

[8] Evidence was presented that it is possible to maintain control of a vehicle for several seconds after it runs over a spike strip because such devices cause tire deflation to occur slowly.

high embankment and disappeared over it.  None of the law-enforcement officers heard any gunshots after the shots were fired at Officer Nelson's car.  None of them had fired any shots throughout the chase.

The deputies "established a perimeter along the embankment."  The terrain below the embankment was at a grade of "approximately 45 degrees" and was "very rough[,] . . . very difficult to walk down, loose gravel, shrubbery."  "There was . . . heavy vegetation, downed tree limbs, logs, that kind of thing."  It was "very difficult to see" because it was dark and the number of cars stopping in the turnout had kicked up a lot of dust.

Fiore woke up and realized he had driven off the road.  He was "bleeding all over the place" and knew he had shot himself in the head.  He tried to honk the Jeep's horn, but it did not work.  He climbed out of the driver's-side window and started walking up the hill to seek help.

About 25 minutes had passed since the Jeep went over the embankment when the deputies saw Fiore.  Deputy Landreneaux ordered him to put his hands up and walk up the hill, and Fiore obeyed.  After Fiore was "about halfway up the hill," Deputy Landreneaux told him to take off his sweater.  Fiore was wearing a bulletproof vest.  He took it off and continued up the hill.  Deputy Landreneaux characterized Fiore as "very cooperative . . . .  [H]e did exactly what we told him."

Deputy Jesse Taylor arrested Fiore.  Fiore "had a large amount of blood extending from his chin under his neck area down to his shirt" and "a bloody wound on his forehead."  He had a bullet hole under his chin and another one in the top of his head.  He seemed to be in shock.  Fiore gave his name to Deputy Taylor and told him that he had "tried to shoot himself."  After Fiore was taken into custody, Fields's body was discovered on the hillside.

Deputy Conlin rode with Fiore in the ambulance to a hospital.  Fiore was "cognizant of what was going on" and "seemed shocked to be alive."  Fiore was hard to understand because he had a hole in his mouth, and "[i]t sounded like he had a mouthful of marbles."  Most of their communication was through hand gestures, "almost like

12

playing charades." By placing his fingers beneath his chin and pretending to pull a trigger, Fiore indicated to Deputy Conlin that he had tried to commit suicide. He would not identify the Jeep's other occupant, but he indicated that he had driven the Jeep and that his friend had done all the shooting at the law-enforcement vehicles. Deputy Conlin testified that Fiore also indicated that his friend had shot himself with the AK-47. Fiore could not recall talking to Deputy Conlin.[9]

### E.     The Physical Evidence.

The Jeep fell about 175 feet below the embankment and left a "debris field" in its wake. CHP Officer Willard O'Diear, an expert in accident reconstruction and collision analysis, testified that the Jeep had rolled over at least three times. It sustained "severe damage" in its trip down the hill. All of the windows except the right rear passenger's window, which was all the way up, were broken. There was "tinted darker glass" in the rear cargo area and on the rear bumper and "green[-]colored windshield glass throughout the vehicle." Officer O'Diear testified that if the rear cargo window had shattered as the Jeep was traveling, the vast majority of the glass would have fallen outside, not inside, the vehicle.

The Jeep's interior after multiple rollovers was likened "to the inside of a clothes dryer." Blood was all over the car's interior and "items [were] strewn all about," many of them also covered in blood. The evidence tended to show that at the time of the crash, Fiore had been wearing his seatbelt and Fields had not. Officer O'Diear testified that the location of blood spatter and an imprint of the AK-47 on the Jeep's headliner established that Fields's body and that gun had been thrown backward against it and were not in the rear cargo area when the Jeep went over the embankment. The roof liner had a hole in it that corresponded to a bullet hole in the exterior of the driver's side of the roof, which

---

[9] During the defense case, a psychiatrist testified that although the bullet did not hit Fiore's brain, Fiore had a brain injury as a result of the concussive force of either the bullet or the crash and also suffered from post-traumatic stress disorder. The physical and emotional trauma Fiore sustained could have affected his ability to remember details and caused him to form incorrect memories.

13

was too big to have been caused by a 7.62-by-39-millimeter round, the type of bullet fired by an AK-47. An evidence technician, Karen Quenell, testified that on "the interior front passenger door panel" there was "what appear[ed] to be blood, possible tissue or brain matter[,] and possible bone fragments."

A Glock .45 and an AK-47 were recovered near the Jeep. The AK-47 had 25 rounds still in the magazine. The Glock's magazine was empty, and there was one round in the chamber. Neither gun had usable latent prints on it. Unused ammunition from both guns was found on the hillside and in the Jeep. Expended 7.62-by-39-millimeter cartridges were found on the hillside and in the Jeep, and one expended .45 cartridge was found inside the Jeep. A large quantity of bagged and loose marijuana was located on the hillside and inside the Jeep, and bundles consisting of a $100 bill wrapped around $1 bills, totaling $1,198, were located in a backpack on the Jeep's front passenger floor. Two casings from .45-caliber bullets were recovered in the road at milepost 35.88, and an expert in firearms identification testified that a bullet recovered from Officer Noland's vehicle was consistent with the type of bullet fired by a Glock .45. No bullets, cartridges, or glass were recovered at any other location along Highway 299.

Fields's body was found about 15 feet from the Jeep. Fields had gunshot wounds through both of his temples, and the sweatshirt he was wearing had a small hole on the left side of the hood and a larger hole on the right side that lined up with those wounds, suggesting that Fields had his hood up when he was shot. A 7.62-by-39-millimeter cartridge case was found inside Fields's sweatshirt. He had a necklace pendant in the shape of an AK-47.

The forensic pathologist who performed Fields's autopsy testified that based on the "beveling of the bone" in Fields's skull where the bullet had hit it, the wounds to Fields's head were "consistent [with] a bullet entrance wound on the . . . left side of the head, and then an exit wound on the right side of the head," "slightly above and in front of [both] ear[s]." The coroner who assisted at the autopsy explained that exit wounds are generally bigger than entrance wounds, "[s]ometimes caused by expansion of the bullet, and sometimes caused by what we call secondary missiles, pieces of bone going out."

14

There was no "gun[]powder stippling[,] . . . soot[, or] muzzle imprint" on the skin around the entrance wound, which was consistent with Fields's having been shot at close range while wearing the hood. Testimony was also introduced that people who use guns to commit suicide are more likely to use their dominant hand to do so. Since Fields was right-handed, the physical evidence tended to suggest that he had not shot himself.

The bullet that killed Fields was never recovered. The forensic pathologist opined that the wound was "caused by a large[-]caliber handgun," such as a Glock .45, and "was not caused by a high[-]velocity round," such as one from an AK-47, which would have caused significantly more damage. The coroner agreed that the wound could have been caused by a Glock .45 and did not appear to be caused by "a high-powered rifle," which "would cause much more vast destruction." A defense expert in firearms and ballistics, however, indicated that it was possible for a 7.62-by-39-millimeter round to travel through the head without causing a "huge explosion."

Officer O'Diear testified that Fields and Fiore most likely were shot before the Jeep went over the embankment. Based on the tire marks on the road before the embankment, there was little "steering input" and the Jeep's brakes were not applied, making it most likely that either the driver was already incapacitated or the car was "deliberately steered" into the embankment. Fiore testified that he could not recall grabbing the Glock or shooting himself, and he could not remember how Fields was shot.

II.
DISCUSSION

A.    *The Trial Court Properly Did Not Instruct the Jury that Duress May Be a Defense to Felony Murder.*

Fiore argues that the trial court erred by not instructing the jury that duress is a defense to felony murder. We disagree.

Although the jury was not instructed that duress is a defense to felony murder, it was instructed that duress is a defense to robbery. It was instructed, under a modified version of CALCRIM No. 3402, that Fiore was "not guilty of attempted murder[,] robbery, burglary, transportation of marijuana, resisting a peace officer, shooting at an

15

occupied vehicle[,] or evading a peace officer if he acted under duress." Fiore's trial counsel did not object to this instruction.

After giving the instruction on duress as a defense to robbery and other crimes, the trial court discussed with counsel whether duress could be a defense to felony murder if it "negate[d] the robbery." The court determined there was no need to instruct the jury that duress may be a defense to felony murder, observing that "if the jury does not find Mr. Fiore guilty of the robbery[,] then they cannot find him guilty of murder based upon that particular theory. The only means by which they could find him guilty would be by some theory other than felony murder. So I am satisfied, while the instruction I think could be more legally precise, I don't know that I can make it understandable to the jury, necessarily. And it's correct, in fact, as it's stated." The court asked Fiore's trial counsel if he had "any comments . . . to put on the record relative to that," and counsel responded, "No, Your Honor. Thank you."

Fiore contends that his claim of instructional error is preserved for review because, even though his trial counsel did not object to the instruction below, his counsel "did not agree with it, either." We conclude the claim is reviewable, but for a different reason. An appellate court may review an instruction regardless whether an objection to it was raised below when the claim on appeal is that the instruction was "an incorrect statement of the law . . ., or the instructional error affected the defendant's substantial rights." (*People v. Mason* (2013) 218 Cal.App.4th 818, 823; § 1259; see also *People v. Wilkins* (2013) 56 Cal.4th 333, 348-349.) Here, Fiore contends that the instruction was legally incorrect and failed to "instruct the jury correctly on a necessary element of the crime."[10]

We review a claim of instructional error de novo. (*People v. Ghebretensae* (2013) 222 Cal.App.4th 741, 759.) " ' "[T]he correctness of jury instructions is to be determined from the entire charge of the [trial] court, not from a consideration of parts of an instruction or from a particular instruction." ' " (*People v. Musselwhite* (1998) 17 Cal.4th

---

[10] Because we conclude that the claim is reviewable, we do not consider Fiore's alternative argument that his attorney's failure to object below constituted ineffective assistance of counsel.

16

1216, 1248.)  In particular, " ' "[t]he absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole." [Citation.]' "  (*People v. Bolin* (1998) 18 Cal.4th 297, 328.)  "Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions."  (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

We must address Fiore's claim that the trial court erred in failing to instruct the jury on duress as a defense to felony murder even though the jury may have unanimously convicted Fiore of malice murder.  This is because the jury was instructed it could convict Fiore of second degree murder on the alternative theories of felony murder or malice murder.[11]  Since we cannot tell from the verdict which of those theories the jury accepted, we must consider Fiore's claim of instructional error even though it bears only on the theory of felony murder.  (See *People v. Morales* (2001) 25 Cal.4th 34, 43.)

Turning to the merits of Fiore's argument, we are not persuaded by it.  Duress is generally not a defense to murder, although it "can, in effect, provide a defense to murder on a felony-murder theory by negating the underlying felony."  (*People v. Anderson* (2002) 28 Cal.4th 767, 772, 784; § 26.)  "If one is not guilty of the underlying felony due to duress, one cannot be guilty of felony murder based on that felony."  (*Anderson*, at p. 784.)  The jury here was instructed that to convict Fiore of felony murder, it had to find that he committed robbery.  It was also instructed that duress is a defense to robbery.  We must assume that the jury followed these instructions and would not have found Fiore guilty of murder on a felony-murder theory had it believed that he participated in the robbery under duress.

---

[11] If the jury had been instructed that Fiore was guilty of first degree murder if it accepted the felony-murder theory, Fiore's conviction for second degree murder would have established that the jury unanimously accepted the theory of malice murder.  But the jury was instructed (incorrectly, *ante,* fn. 1) that either theory would result in a conviction for second degree murder, and it was instructed (correctly) that it did not have to unanimously agree on a theory of felony murder or a theory of malice murder to return a guilty verdict on the murder charge.  (See § 26, subd. six; *People v. Moore* (2011) 51 Cal.4th 386, 413.)

Fiore makes two arguments that, while couched in terms of prejudice, go to whether the trial court improperly failed to instruct the jury on duress as a defense to felony murder. First, he argues that the jury could have concluded that he was guilty of felony murder without considering whether "he was only continuing to participate in the robbery because of duress." But this argument incorrectly assumes that he would not be guilty of felony murder if the jury found that he no longer wanted to participate in the robbery at the time he killed Fields.[12] Section 189's requirement that a killing be "committed in the perpetration of" the underlying felony is satisfied as long as the two crimes " ' "are parts of one continuous transaction." ' " (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1141.) " 'There is no requirement of a strict "causal" [citation] or "temporal" [citation] relationship between the "felony" and the "murder." ' " (*Ibid.*) Rather, section 189 " 'obviat[es] the necessity for . . . any technical inquiry concerning whether there has been a completion, abandonment, or desistence of the [felony] before the homicide was completed.' " (*People v. Cavitt* (2004) 33 Cal.4th 187, 207.) Although it is true that a defendant must have "intended to commit [the applicable felony] 'either prior to or during the commission of the acts which resulted in the victim's death' " (*People v. Lewis* (2001) 25 Cal.4th 610, 647), this requirement was satisfied here because Fiore had to have formed the requisite intent for robbery before he shot Fields. In short, once the jury concluded that Fiore committed robbery, his liability for felony murder was unaffected by whether he was still a willing participant in the robbery at the time of the killing.

Fiore's second argument is that the trial court's failure to instruct the jury on duress as a defense to felony murder prevented him from establishing a withdrawal defense to that crime. Withdrawal is a defense to aiding and abetting, as the jury was instructed under CALCRIM No. 401. But if Fiore was liable for felony murder, it was

---

[12] Regardless whether the individual jury members found Fiore guilty under a theory of malice murder or felony murder, they necessarily concluded that he killed Fields because they were specifically instructed that they could not find him guilty of murder if they found that Fields committed suicide.

18

not on the theory that he aided and abetted the killing. A withdrawal defense was only relevant to the murder count to the extent it affected his liability for robbery. Fiore's implication that he could have somehow withdrawn from the robbery for the purpose of application of the felony-murder rule is incorrect for the reasons already given. (See *People v. Cavitt*, *supra*, 33 Cal.4th at p. 207.)

We conclude that the trial court did not err in declining to instruct the jury that duress is a defense to felony murder.

B.      *The Trial Court Properly Instructed the Jury on When the Intent to Aid and Abet a Robbery May Be Formed.*

Fiore contends that the trial court erred by instructing the jury that he could be guilty of robbery on an aiding-and-abetting theory even if he formed the intent to aid and abet the robbery after Fields began to carry away the stolen property. We disagree.

The jury was instructed under CALCRIM No. 1603 that "[t]o be guilty of robbery as an aider and abettor, the defendant must have formed the intent to aid and abet the commission of the robbery before or while the perpetrator carried away the property to a place of temporary safety. A perpetrator has reached the place of temporary safety with the property if he or she has successfully escaped from the scene, is no longer being pursued[,] and has unchallenged possession of the property."

Fiore did not object to this jury instruction below. But we will review his argument because he once again claims that the alleged error amounted to a "failure to instruct correctly on . . . a necessary element" of a crime. (See *People v. Wilkins*, *supra*, 56 Cal.4th at pp. 348-349; § 1259.) As we were required to do on his first claim, we review this claim de novo, and we consider the instruction in context with the others given. (*People v. Musselwhite*, *supra*, 17 Cal.4th at p. 1248; *People v. Ghebretensae*, *supra*, 222 Cal.App.4th at p. 759.)

The challenged instruction embodies the holding of *People v. Cooper* (1991) 53 Cal.3d 1158 (*Cooper*). In that case, our state Supreme Court held that a defendant may be convicted of robbery as an aider and abettor as long as the defendant's intent to facilitate or encourage the robbery is "formed before or during [the] carrying away of the

19

[stolen property] to a place of temporary safety." (*Id.* at p. 1161, italics omitted.) The court observed that although a robbery is "initially committed" when all the elements of robbery are present, "for purposes of determining aider and abettor liability, the commission of a robbery continues until all acts constituting the offense have ceased." (*Id.* at p. 1164, italics omitted.) The court determined that aiding and abetting liability for robbery can arise any time during asportation, an element that "is initially satisfied by evidence of slight movement" but continues as long as "the [stolen property] is being carried away to a place of temporary safety." (*Id.* at p. 1165, italics omitted.)

Fiore characterizes *Cooper, supra*, 53 Cal.3d 1158 as overturning the "traditional rule in California that a person who forms his intent to assist a crime after it ha[s] been committed . . . is only liable as an accessory after the fact," and he urges that *Cooper*'s holding is "ripe for reconsideration." Whatever the merits of his view, we are bound by *Cooper* and are not at liberty to disregard it. (See *Auto Equity Sales v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Fiore argues that there is nevertheless "an open question as to whether the *Cooper* rule applies to felony murder" and that "felony[-]murder liability for aiders and abettors" should not be extended to those who form their intent to assist during the escape portion of a robbery. He primarily relies on a bench note to CALCRIM No. 1603 that provides the instruction should not be given "if the defendant is charged with felony murder." (CALCRIM No. 1603.) These "use notes," however, do not "have the force of law." (*People v. Alvarez* (1996) 14 Cal.4th 155, 223, fn. 28.) More importantly, this particular note appears to address a concern, raised in *People v. Pulido* (1997) 15 Cal.4th 713, that is inapplicable here. In that case, our state Supreme Court held that a defendant is not guilty of felony murder under section 189 if the defendant aids and abets a robbery *after* an accomplice has "kill[ed] in the perpetration of [that] robbery." (*Id.* at p. 716.) The court observed that in light of its holding, CALJIC No. 9.40.1, the precursor to CALCRIM No. 1603, could incorrectly "suggest to a jury that a person who aids and abets only in the asportation phase of robbery, after the killing is complete, is nonetheless guilty of first-degree murder under the felony-murder rule." (*Id.* at p. 728.) Here,

20

however, there is no question that if Fiore formed the requisite intent for robbery, he did so before he killed Fields.

Fiore also argues that the holding of *Cooper*, *supra*, 53 Cal.3d 1158 should not be applied to felony murder because, just as participants in a conspiracy "are not liable for substantive crimes which were committed before their entry into the conspiracy, late-joining aider[s] and abettors should similarly not be liable." We fail to understand how this analogy helps Fiore since, again, he formed any intent to aid and abet the robbery before he killed Fields. Furthermore, the decisions Fiore cites limited liability for acts that were not committed by the defendant. (*People v. Pulido*, *supra*, 15 Cal.4th at p. 720 ["At the outset, it should be emphasized we are not concerned here with that part of the felony-murder rule making a killer liable for first degree murder if the homicide is committed in the perpetration of robbery. This case involves only the question of a *nonkiller*'s liability for the felony murder committed by another," italics in original]; *People v. Marks* (1988) 45 Cal.3d 1335, 1345.) Here, the jury concluded that the act giving rise to liability—Fields's killing—was committed by Fiore. We see no reason to conclude that Fiore is less liable for killing Fields just because Fiore formed the requisite intent for robbery after Fields had already committed robbery.

For a similar reason, we reject Fiore's suggestion that it would be "unjust" and would extend the felony-murder rule " 'beyond any rational function that it is designed to serve' " to hold that a late-joining aider and abettor to robbery may be liable for felony murder. (*People v. Pulido*, *supra*, 15 Cal.4th at p. 724.) The purpose of the felony-murder rule " 'is to deter those engaged in felonies" that are inherently dangerous " 'from killing negligently or accidentally.' " (*People v. Bryant* (2013) 56 Cal.4th 959, 965.) Fiore formed his intent to aid and abet the robbery, at the latest, during the escape but before he killed Fields. Holding Fiore liable for Fields's death is perfectly consistent with the goal of deterring killings committed in the course of serious felonies.

Finally, Fiore argues that it would violate due process "to retroactively expand the felony[-]murder statute to include an aider and abettor . . . whose intent to assist the robber did not arise until after the taking was completed[] and until after the escape

21

began." He relies on *Bouie v. Columbia* (1964) 378 U.S. 347, in which the United States Supreme Court held that "an unforeseeable judicial enlargement of a criminal statute, applied retroactively," violates due process because it deprives a defendant of "fair warning of the conduct which [the statute] prohibits." (*Id.* at pp. 350, 353-354.) Again, we are not persuaded. We do not see how holding Fiore liable for felony murder on the basis of a robbery he was guilty of under *Cooper*, *supra*, 53 Cal.3d 1158 constitutes an unforeseeable judicial enlargement of section 189. *Cooper* itself, of course, cannot support Fiore's argument because it was decided well before the events in question. (See *Bouie*, at p. 362.) Similarly, the escape rule was well established at the time of Fiore's offenses. Under this rule, a defendant is liable for felony murder committed in the perpetration of robbery if he kills at any time " ' throughout the flight of [the] perpetrator from the scene of a robbery until the perpetrator reaches a place of temporary safety.' " (*People v. Wilkins*, *supra*, 56 Cal.4th at p. 345, quoting *People v. Thongvilay* (1998) 62 Cal.App.4th 71, 77.) These principles rendered it entirely foreseeable that Fiore could be found guilty of felony murder if, after the marijuana was stolen but before Fields reached a place of temporary safety, Fiore formed an intent to aid the robbery and then killed Fields. We conclude that the trial court properly instructed the jury with CALCRIM No. 1603.

> C.     *Any Error in the Admission of Opinion Testimony About the Appearance of Brain Matter and Bone Fragments Was Harmless.*

Fiore claims that the trial court erred by allowing evidence technician Karen Quenell to testify that she observed possible brain matter and bone fragments on the inside of the Jeep's passenger-side door and that this error requires reversal of his murder conviction and both attempted-murder convictions. He argues that "whether a substance is 'brain tissue' . . . [or] 'bone matter' " "is beyond common knowledge" and requires expert testimony, yet Quenell was not qualified as an expert on either subject. We conclude that any error in the admission of Quenell's testimony was harmless.

The prosecutor showed Quenell a photograph of the Jeep's interior and asked her what it depicted. She testified that it was "a photograph of the interior front passenger

22

door panel" and showed "what appears to be blood, possible tissue or brain matter[,] and possible bone fragments." The prosecutor never sought to qualify Quenell as an expert on any subject related to the identification of such materials. Fiore's trial counsel objected that the testimony was speculative and lacked foundation. The trial court overruled the objection, stating, "I think based on her expertise and her testimony it is possible blood, bone[,] and brain material, so I will allow it to stand." On cross-examination, Fiore's counsel elicited the information that this evidence had not been collected or tested, and Quenell admitted she could not say "[d]efinitively" what the material on the door panel was.

An expert who is properly qualified may offer an opinion, based on his or her "special knowledge, skill, experience training, [or] education," that is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subds. (a), (b); *People v. Chapple* (2006) 138 Cal.App.4th 540, 546.) " 'Expert opinion is not admissible if it consists of inferences and conclusion which can be drawn as easily and intelligently by the trier of fact as by the witness. [Citation.]' " (*Chapple*, at pp. 546-547.)

In contrast, a lay witness's opinion " ' "is admissible where no particular scientific knowledge is required, or as 'a matter of practical necessity when the matters . . . observed are too complex or too subtle to enable [the witness] accurately to convey them to [the trial] court or jury in any other manner.' [Citations.]" [Citation.]' " (*People v. Chapple*, *supra*, 138 Cal.App.4th at p. 547.) Unlike an expert opinion, a lay opinion must involve a subject that is " 'of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness.' " (*Ibid.*) There is no "third category of admissible opinions provided by highly experienced, nonexpert, lay witnesses." (*Id.* at p. 548.) Although a lay "witness's experience may affect the weight of the testimony," the witness's "opinion testimony may rest only on common experience." (*Id.* at p. 548 & fn. 5.)

We need not decide whether Quenell's testimony was admitted as an expert opinion or whether it should have been excluded because we conclude that any error in

its admission was harmless. Fiore argues that Quenell's opinion "supported the prosecution theory that Fields was shot from left to right while sitting in the front seat," and therefore that Fiore was the one who shot Fields and shot at Officer Noland.[13] But there was substantial other evidence to support the conclusion that Fiore was responsible for these shots. The deputies who participated in the chase consistently testified that, except for the shots fired at Officer Noland, all of the shooting was from the front passenger's side of the Jeep. This testimony supported the inference that Fields was located in the passenger's position throughout the chase. The weight of the physical evidence and expert testimony also established that the bullet that killed Fields was traveling from left to right as it entered Fields's head, and it was not likely that Fields shot himself by holding a gun to his left temple since he was right-handed. This evidence suggesting that Fiore killed Fields was strong, and Quenell's testimony added very little to it. Quenell merely testified on direct examination that the photograph depicted "*possible* tissue or brain matter and *possible* bone fragments" on the door (italics added) and on cross-examination that she was uncertain of the nature of the biological matter and that it was never tested.

Given these factors, we conclude that any purported constitutional error in the admission of Quenell's opinion about the appearance of brain matter and bone fragments was harmless beyond a reasonable doubt (*Chapman v. California* (1967) 386 U.S. 18, 24), and it was not reasonably probable that Fiore would have received a more favorable verdict if the trial court had excluded Quenell's testimony on this issue. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

---

[13] This evidence also supported the conviction for attempted murder of Officer Nelson, even though the prosecution never argued that Fiore was the one who shot at him. If the jury believed Fiore shot at Officer Noland and did not do so under duress, it would have likely found that Fiore was not under duress (and thus was liable as an accomplice) during the attempted murder of Officer Nelson seconds later.

24

> **D.** *Insufficient Evidence Supports Fiore's Conviction for Robbery of Gault.*

The jury convicted Fiore of one count of robbery of Young and one count of robbery of Gault. Fiore claims that there is insufficient evidence to sustain his conviction for robbing Gault because the stolen marijuana undisputedly did not belong to Gault, and Gault did not have possession of it. The Attorney General contends that Gault had constructive possession of the marijuana because he brokered the deal and thus had a "special relationship" with Young. We conclude that this conviction must be reversed.

To evaluate Fiore's claim, " 'we review the whole record to determine whether . . . [there is] substantial evidence to support the verdict . . . such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] "Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the . . . jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." ' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

To be guilty of robbery, a defendant must take property "from the possession of the victim by means of force or fear." (*People v. Nguyen* (2000) 24 Cal.4th 756, 761; § 211.) "A person who owns property or who exercises direct physical control over it has possession of it, but neither ownership nor physical possession is required to establish the element of possession for the purposes of the robbery statute," and "constructive possession" is sufficient. (*People v. Scott* (2009) 45 Cal.4th 743, 749-750.)

"[A] person who has the right to control property has constructive possession of it." (*People v. Scott*, *supra*, 45 Cal.4th at p. 750.) To have constructive possession of property, "the alleged victim of a robbery [must] have a 'special relationship' with the owner of the property such that the victim had authority or responsibility to protect the stolen property on behalf of the owner." (*Ibid.*) As a result of this relationship, such a

25

victim has "the right to resist the taking," in contrast to "those bystanders who have no greater interest in the property than any other member of the general population." (*Id.* at pp. 757-758.) These special relationships are often employment-related. (*Id.* at pp. 752-753 [discussing cases]; see, e.g., *People v. McKinnon* (2011) 52 Cal.4th 610, 687 [teacher had constructive possession of school cafeteria's cash box]; *People v. Bradford* (2010) 187 Cal.App.4th 1345, 1350 [mall security guards had constructive possession of property in stores they were obligated to protect]; *People v. Gilbeaux* (2003) 111 Cal.App.4th 515, 523 [janitors who were independent contractors had constructive possession of property in store they cleaned].) But they may be present in other circumstances as well, such as when the victim is the owner's family member. (See, e.g., *People v. Weddles* (2010) 184 Cal.App.4th 1365, 1370 [owner's brother]; *People v. Gordon* (1982) 136 Cal.App.3d 519, 529 [owner's parents].)

There is insufficient evidence that such a relationship existed between Young, the seller of the marijuana, and Gault. Gault testified that Young was only an "acquaintance" and that he knew him "just [in] passing." Gault had never been to Young's house before the night in question, and the men had little contact after the robbery. Gault claimed that he had not acted as a broker and that he did not expect to earn any commission as a result of the marijuana deal. Fiore testified that he understood Gault to be "brokering" the deal and had heard Fields and Gault agree that Fields would pay Gault $100 for every pound of marijuana bought. Fiore and Gault gave different accounts of the degree of control Gault had over the marijuana. Fiore testified that after Young told Fields to "[c]heck . . . out" the marijuana, Gault handed a bag of marijuana to Fiore, and Gault was the one who rolled the blunts for the men to smoke. Gault, on the other hand, did not testify that he handled the marijuana and denied having rolled the blunts.

The Attorney General argues that Gault had a special relationship with Young because Gault introduced Young to Fields, directed Fields and Fiore to Young's house, helped Fields and Fiore sample the marijuana, "participated in the negotiations over the price for the contraband," and "was going to be paid $100 for each pound of marijuana sold." But this record reveals that if Gault had a special relationship with anyone, it was

26

with Fields, not Young. Gault introduced Fields to Young at Fields's request. The only evidence that Gault was to be paid for participating in the deal was Fiore's testimony that Fields, not Young, promised to pay Gault for each pound of marijuana purchased. And we find nothing in the record to suggest that Gault was involved in negotiating the sale's terms beyond the fact that he was present while Fields and Young were talking. Although the evidence permits an inference that Gault had Young's permission to handle the marijuana for the purpose of letting Fields and Fiore sample it, Young's acquiescence to Gault's momentary control over the property for this limited purpose did not establish that Gault had any right or duty to resist the property's taking or that Young expected him to do so. (See *People v. Ugalino* (2009) 174 Cal.App.4th 1060, 1065 [reversing robbery conviction where victim had "no obligation to protect" owner's marijuana by virtue of being owner's roommate and owner "was present to protect his own belongings and there was no evidence he expected [victim] to assist him in that regard"]; cf. *People v. Bekele* (1995) 33 Cal.App.4th 1457, 1462 [owner's friend had constructive possession of property because owner gave him "implied authority" to resist its taking by seeking his aid to stop the defendant from stealing it], disapproved on other grounds by *People v. Rodriguez* (1999) 20 Cal.4th 1, 13-14.) We conclude there is insufficient evidence that Gault "owned, had access to, [had] control over, or [had] an obligation to protect the [stolen] marijuana" (*Ugalino*, at p. 1065), and we therefore reverse Fiore's conviction for robbery of Gault.

E.      *No Cumulative Error Appears.*

Fiore contends that the cumulative effect of the errors he identifies requires reversal of his convictions, even if none of the errors individually requires reversal. Aside from the lack of evidence to support the conviction for robbery of Gault, the only potential error we have identified is in the admission of Quenell's testimony, which does not justify reversal for the reasons given. We therefore reject Fiore's claim of cumulative error.

27

## III.
### DISPOSITION

The conviction for robbery of Chris Gault (count eight) is reversed. The judgment is otherwise affirmed.

_____
Humes, J.

We concur:

_____
Ruvolo, P.J.


_____
Reardon, J.

*People v. Fiore* (A136116)

| | |
|---|---|
| Trial Court: | Humboldt County Superior Court |
| Trial Judge: | Honorable Christopher G. Wilson |
| Counsel for Appellant: | Stephen B. Bedrick, under appointment by the First District Appellate Project |
| Counsel for Respondent: | Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Senior Assistant Attorney General, Jeffrey M. Laurence, Supervising Deputy Attorney General, Christopher J. Wei, Deputy Attorney General |