Filed 1/3/22  P. v. Leyva CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

| California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115. |
| --- |

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

<table>
<tr><td>

THE PEOPLE,

    Plaintiff and Respondent,

v.

ONRE LEYVA,

    Defendant and Appellant.

</td><td>

E075983

(Super.Ct.No. SWF1900605)

OPINION

</td></tr>
</table>

APPEAL from the Superior Court of Riverside County.  Bonnie M. Dumanis, Judge.  (Retired Judge of the San Diego Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Jeffrey S. Kross, by appointment of the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Alana Cohen Butler, Deputy Attorneys General, for Plaintiff and Respondent.

1

# I. INTRODUCTION

A jury found defendant and appellant, Onre Leyva, guilty as charged of making a criminal threat against L.T. (Pen. Code, § 422,[1] count 4); misdemeanor battery against defendant's former wife and current cohabitant, J.J. (§ 243, subd. (e)(1), count 7); and misdemeanor child abuse or neglect of defendant's 12-year-old child, A.J. (§ 273a, subd. (b), count 8). Defendant was acquitted of several other charges.[2] The court found defendant had a 2011 criminal threats conviction, which constituted a prior serious felony conviction (§ 667, subd. (a)) and a prior strike conviction (§ 667, subds. (c), (e)).

The court sentenced defendant to nine years in state prison: the middle term of two years on count 4, doubled to four years based on the prior strike (§ 667, subd. (c)), plus five years for the prior serious felony conviction (§ 667, subd. (a)). The court imposed concurrent county jail terms of 365 days and 180 days, respectively, on counts 7 and 8, and did not impose any fines or fees on the ground that defendant lacked the ability to pay them.

In this appeal, defendant claims that insufficient evidence supports his conviction in count 4 for making criminal threats against L.T. (§ 422) and his conviction in count 8 for the misdemeanor child abuse of A.J (§ 273a, subd. (b)). He also claims the jury was

---

[1] Unspecified statutory references are to the Penal Code.

[2] The jury acquitted defendant of first degree residential burglary (§ 459, count 1), making a criminal threat against J.L. (§ 422; count 3), the false imprisonment of J.L. (§ 236, count 5), and the false imprisonment of L.T. (§ 236, count 6). The court declared a mistrial in count 2, in which defendant was charged with unlawfully driving or taking a vehicle (§ 10851, subd. (a)), after the jury failed to reach a verdict in count 2. At sentencing, the court dismissed count 2 pursuant to the People's motion.

erroneously instructed that it could consider evidence of his prior domestic violence-related convictions (Evid. Code, § 1109, subd. (a)), in determining whether it was likely that he criminally threatened L.T. as charged in count 4. We find no merit to any of these claims and affirm the judgment.

## II. TRIAL EVIDENCE

In 2019, L.T. and J.L. were around 24 years old and had been friends for over 15 years. For several weeks during the summer of 2019, including in July, L.T. lived with J.L.; J.L.'s younger sister, A.J.; and J.L. and A.J.'s parents, defendant and J.J., at J.J.'s home in Menifee. Defendant and J.J. were divorced and lived in separate rooms. A.J. was around 12 years old, had Down syndrome, and was nonverbal. L.T. was looking for a job.

During the evening of July 25, 2019, L.T., J.L., A.J., J.J., and defendant went to dinner at a pizza restaurant in Lake Elsinore to celebrate a job interview that L.T. had had that afternoon. J.J. drove the group to the restaurant in her white car. Other than A.J., everyone was drinking beer. When they left the restaurant, J.J. was driving, defendant was in the front passenger seat, and L.T. was in the backseat between J.L. and A.J. Of the five occupants of the car, only L.T. testified at trial.

L.T. testified that J.J. and defendant began yelling at each other during the drive home. L.T. did not remember seeing defendant punch J.J. in her head; he only saw defendant and J.J. raise their hands at each other. But later, on the night of July 25, L.T. told a sheriff's deputy that he saw defendant hit J.J. several times in her head as she was

3

driving. On the same night, J.J. told a 911 dispatcher that defendant "started socking [her] on the back of [her] head as [she] was driving."

J.J. pulled her car to the side of the road, which L.T. described as "a dirt road, poorly lit." J.T. recalled that defendant and J.J. got out of the car and continued their conversation near the rear of the car. Defendant then got into the driver's seat of the car and "sped off," leaving J.J. on the side of the road. In contrast to L.T.'s trial testimony, J.J. told the 911 dispatcher on July 25, 2019, that defendant pulled her out of the car, threw her into a ditch, and left her on the side of the road.

After defendant sped away, he drove "erratic[ally]." He kept saying he was going to kill everyone in the car and that he was also going to "kick" L.T's "ass." He did not direct his statements about killing everyone in the car to anyone in particular. Still, L.T. was frightened. J.L. looked nervous, but L.T. did not have a chance to look at A.J. and did not hear whether A.J. was crying. No one in the car said anything to defendant.

Defendant stopped the car at a gas station and, using profanity, told everyone to get out of the car. J.L. told L.T. not to leave the car, so L.T. did not get out of the car despite being fearful of defendant. At this point, A.J. looked "confus[ed] and uncertain[]," which was unusual for her. Defendant became more upset and sped out of the gas station parking lot, with L.T., J.L., and A.J. still in the car. Defendant then drove to J.J.'s home, parked her car in the driveway, went inside, and returned with his "hands full" of personal possessions, including a coin collection. J.L., L.T., and A.J. stayed in the car while defendant was inside the home. Defendant then drove away in J.J.'s other vehicle, which was parked in the driveway.

4

After defendant drove away, J.L consoled A.J. Next, J.L., with L.T. and A.J. in the car, drove J.J.'s car to pick up J.J. and found her where defendant had left her on the side of the road. J.J. was "yelling and complaining, and very loud and distressed." The four of them returned to J.J.'s home, and J.J. called 911. The deputy sheriff who responded to the 911 call described J.J., J.L., and L.T. as "very upset," "shaken up," "nervous," and "in disbelief" over what had happened.

Portions of J.J.'s 911 call were played for the jury. As noted, J.J. told the 911 dispatcher that defendant started hitting her in the back of her head while she was driving. When J.J. pulled the car over, defendant pulled her out of the car, threw her into a ditch, took her car, went to her home, stole her coin collection, and left in a different car.

Months later, in December 2019, Riverside County Sheriff's Department deputies responded to a report of a domestic disturbance at J.J.'s Menifee home. They found defendant at the home and arrested him on an outstanding warrant. The parties stipulated that defendant had three prior convictions involving domestic violence: a 2011 felony conviction for making criminal threats (§ 422), and 1995 felony convictions for assault (former § 245, subd. (a)(1)), and vandalism (§ 594).

Robert C., a detective and master investigator for the Riverside County Sheriff's Department, investigated domestic violence crimes and had been part of the department's "domestic violence threat management team" since 2011. He testified as an expert on "the cycle" of domestic violence and the "power and control" dynamic in relationships affected by domestic violence. Victims of domestic violence tend to recant their

5

allegations and are reluctant to participate in legal processes against the perpetrators of the domestic violence.

### III. DISCUSSION

A. *Substantial Evidence Supports Defendant's Criminal Threats Conviction in Count 4*

Defendant first claims insufficient evidence supports his conviction in count 4 for making criminal threats against L.T. (§ 422.) We conclude that substantial evidence supports each element of the claim.

1. Standard of Review

We begin with the standard of review, which is well settled: In reviewing a claim that insufficient evidence supports a criminal conviction, we review the entire record in the light most favorable to the judgment, in order to determine whether the record contains substantial evidence—evidence that is reasonable, credible, and of solid value— such that a reasonable trier of fact could have found defendant guilty of the crime beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578 (*Johnson*).)

In reviewing the record for substantial evidence, we presume in support of the judgment the existence of every fact the trier of fact could have reasonably deduced from the evidence. (*People v. Davis* (1995) 10 Cal.4th 463, 509.) Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence. (*People v. Clark* (2011) 52 Cal.4th 856, 943.) An inference is unreasonable if it is predicated solely on speculation. (*People v. Holt* (1997) 15 Cal.4th 619, 669.)

But " ' "[i]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be

6

reconciled with a contrary finding." ' " (*People v. Solomon* (2010) 49 Cal.4th 792, 816.) Reversal of a conviction for insufficient evidence is unwarranted unless it appears that, " ' "upon no hypothesis whatever," ' " is there sufficient substantial evidence to support the conviction. (*People v. Wilson* (2010) 186 Cal.App.4th 789, 805 (*Wilson*).)

 2.  Applicable Legal Principles and Analysis

 A defendant commits a criminal threat, even if the defendant did not intend to carry out the threat, but, rather, specifically intended the threat "to be taken as a threat, . . . which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety . . . ." (§ 422.)

 To convict a defendant of making criminal threats in violation of section 422, the prosecution must prove five elements: "(1) [T]hat the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat. . . was 'on its face and under the circumstances in which it [was] made, . . . *so unequivocal, unconditional, immediate, and specific* as to convey to the person threatened, a gravity of purpose and *an immediate prospect* of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety . . . ,' and (5) that the threatened person's fear was 'reasonabl[e]' under

the circumstances." (*People v. Toledo* (2001) 26 Cal.4th 221, 227-228 (*Toledo*), italics added.)

Our Supreme Court has explained, "[w]ith respect to the requirement that a threat be 'so unequivocal, unconditional, immediate, and specific as to convey to the person threatened a gravity of purpose and an immediate, prospect of execution of the threat,'. . . that the word 'so' in section 422 meant that ' "unequivocality, unconditionality, immediacy and specificity are not absolutely mandated [to be in the threat itself], but must be sufficiently present in the threat and surrounding circumstances." ' " (*In re George T.* (2004) 33 Cal.4th 620, 635, quoting *People v. Bolin* (1998) 18 Cal.4th 297, 340.)

In applying this interpretation, the Court of Appeal has noted: " 'It is clear that the nature of the threat cannot be determined only at face value. Section 422 demands that the purported threat be examined "on its face and under the circumstances in which it was made." The surrounding circumstances must be examined to determine if the threat is real and genuine, a true threat,' and such threats must be 'judged in their context.' [Citations.] '[Section 422] does not concentrate on the precise words of the threat. Instead, the statute focuses on the effect of the threat on the victim, to wit, communication of a gravity of purpose and immediate prospect of execution of the threat.' " (*Wilson*, *supra*, 186 Cal.App.4th at p. 807.)

Thus, in determining whether a statement amounts to a criminal threat, the trier of fact can consider the defendant's statement itself, together with all of the circumstances surrounding the statement. (*In re Ryan D.* (2002) 100 Cal.App.4th 854, 860.) Relevant

8

circumstances include the defendant's mannerisms, affect, actions in making the threat, and subsequent actions. (*People v. Solis* (2001) 90 Cal.App.4th 1002, 1013.)

Defendant's substantial evidence claim is directed to the second through fifth elements of his criminal threats conviction in count 4, as set forth in *Toledo*, *supra*, 26 Cal.4th at pages 227 to 228.[3] He does not dispute the evidence that he threatened to kill everyone in the car. Instead, he argues, "the surrounding circumstances evident in this case undermine any sense that [his] threats were genuine, that he intended them to be taken seriously, or that they were taken seriously." In other words, he argues, his threats to kill everyone in the car were "insufficiently definite" to convey to L.T. a sense of his " 'gravity of purpose and an immediate prospect of execution of the threat[s],' " such that

---

[3] The jury was instructed on the elements of the criminal threat charges in counts 3 and 4 pursuant to CALCRIM No. 1300. The instruction stated the same five elements of a criminal threat as stated in *Toledo*, *supra*, 26 Cal.4th at pages 227 to 228, but expressed the five elements as six elements.

For count 4, the jury was instructed that the People had to prove that: "1. The defendant willfully threatened to unlawfully kill or unlawfully cause great bodily injury to . . . [L.T.] . . . ; [¶] 2. The defendant made the threat orally; 3. The defendant intended that his statement be understood as a threat to . . . [L.T.] . . . ; [¶] 4. The threat was so clear, immediate, unconditional, and specific that it communicated to . . . [L.T.] . . . a serious intention and immediate prospect that the threat would be carried out; [¶] 5. The threat actually caused . . . [L.T.] . . . to be in sustained fear for [his] own safety; [¶] AND [¶] 6. . . . [L.T.] . . . had fear that was reasonable under the circumstances." (CALCRIM No. 1300.)

CALCRIM No. 1300 elaborated on several of these elements: "Someone commits an act willfully when he or she does it willingly or on purpose. [¶] In deciding whether a threat was sufficiently clear, immediate, unconditional, and specific, consider the words themselves, as well as the surrounding circumstances. [¶] Someone who intends that a statement be understood as a threat does not have to actually intend to carry out the threatened act. [¶] Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm. [¶] Sustained fear means fear for a period of time that is more than momentary, fleeting, or transitory. [¶] An immediate ability to carry out the threat is not required."

9

his threats actually caused L.T. "reasonably to be in sustained fear for his own safety." (§ 422.)

Defendant minimized the gravity of his threats. He points out that L.T. told the sheriff's deputy who responded to J.J.'s 911 call that defendant was "saying things out loud" or "blurting things out" as he was thinking them, as if he were just " 'thinking out loud.' " He also argues that L.T. must not have been in actual or sustained fear of his threats because L.T. did not get out of the car when he pulled into the gas station parking lot and ordered everyone in the car to get out. He reasons that, if his threats to kill everyone put L.T. in genuine fear of death or great bodily injury, then L.T. would have gotten out of the car. Instead, L.T. chose to stay in the car despite defendant's "angry, scattershot ramblings." Thus, he argues, "nothing more substantial than speculation" supports the jury's guilty verdict in count 4. We disagree.

In light of defendant's repeated threats that he was going to kill everyone in the car, together with circumstances in which defendant made the statements, substantial evidence supports each element of defendant's criminal threats conviction in count 4. First, it is undisputed that defendant threatened to kill everyone in the car and, in doing so, "willfully threaten[ed] to commit a crime which [would have] result[ed] in death or great bodily injury to another person. (*Toledo*, *supra*, 26 Cal.4th at pp. 227-228.) Thus, substantial evidence supports the first element of the section 422 conviction in count 4.

Substantial evidence also shows that defendant made the threat " 'with the specific intent' " that L.T. "take" or understand the threat "as a threat"—the second element of a section 422 violation. (*Toledo*, *supra*, 26 Cal.4th at p. 228.) Minutes before he

10

threatened to kill everyone in the car, defendant was yelling at his ex-wife, J.J.; hit her in her head while she was driving; then threw her into a ditch, left her on the side of the road; and drove away in her car. Then, as he was driving "erratic[ally]," he repeatedly told everyone who was still in the car—J.L., L.T., and A.J.—that he was going to kill them. He also told L.T. that he was going to " 'kick [L.T.'s] ass.' " Based on all of this evidence, the jury reasonably could have inferred that defendant specifically intended for L.T. to understand or "take" his threats to kill everyone "as threats." (§ 422.)

Third, defendant's threats to kill everyone in the car, and the circumstances in which the threats were made, support a reasonable inference that the threats were "so unequivocal, unconditional, immediate, and specific" as to convey to L.T. a sense of defendant's " 'gravity of purpose and an immediate prospect' " that defendant would carry out the threats—the third element of a section 422 violation. (*Toledo*, *supra*, 26 Cal.4th at p. 228.) There was nothing equivocal or conditional about defendant's threats to kill everyone in the car. Rather, the threats were specific. He kept saying, " 'I'm going to kill you [n's].' " The gravity of defendant's purpose and the immediate prospect that he would carry out the threats are also shown by the evidence that he had just gotten into a verbal and physical altercation with his ex-wife, J.J., and left her on the side of the road. L.T. also knew that defendant lived in J.J.'s house and that defendant had domestic violence related convictions. L.T. had also never known defendant to be employed. The jury reasonably could have concluded that these circumstances conveyed to L.T. that defendant was desperate enough to carry out his threats.

11

Fourth, substantial evidence shows that defendant's threats to kill everyone "actually caused" L.T. to be in " 'sustained fear' " for L.T.'s safety—the fourth element of the criminal threats charge. (*Toledo*, *supra*, 26 Cal.4th at p. 228.) L.T. told the sheriff's deputy who responded to J.J.'s 911 call that he was afraid *because* defendant kept saying he was going to kill everyone in the car. And, in testifying at trial, L.T. confirmed that what he told the deputy was true: defendant's threats to kill everyone actually made L.T. afraid.[4] L.T. also testified that he did not say anything to defendant while defendant was driving because he was afraid. And, when defendant pulled into the gas station, L.T. explained that he stayed in the car despite being afraid of defendant because J.L. told him to stay in the car, and he had no other way to get home. L.T.'s fear was " 'sustained' " in that it was more than "momentary, fleeting, or transitory." (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156.) Later that night, after defendant left J.J.'s house in her other vehicle, the sheriff's deputy who responded to J.J.'s 911 call saw that L.T. was still "nervous, agitated, [and] in disbelief of what had just occurred."

Fifth and lastly, the circumstances under which the threats were made, as we have described them, demonstrated that L.T.'s sustained fear was reasonable. (*Toledo*, *supra*, 26 Cal.4th at p. 228.) In sum, based on the entire record, the jury reasonably could have

---

**4** L.T. later testified on cross-examination that he was afraid because defendant was driving fast, and because L.T. did not know where they were going. But the jury reasonably could have disregarded this part of L.T.'s testimony, in light of his earlier testimony that defendant's threats made him afraid, and his expressed discomfort in testifying against defendant.

concluded that the prosecution proved each element of the criminal threats charge against L.T. in count 4 beyond a reasonable doubt. (*Johnson*, *supra*, 26 Cal.3d at p. 578.)

B. *Any Error in Instructing the Jury That It Could Consider Defendant's Prior Offenses Involving Domestic Violence in Determining Whether It Was Likely That He Criminally Threatened L.T. as Charged in Count 4 Was Harmless*

Defendant claims the jury was erroneously instructed, pursuant to CALCRIM No. 852A (evidence of uncharged domestic violence), that it could consider defendant's 1995 and 2011 convictions "involving domestic violence" in determining whether it was likely that defendant criminally threatened L.T. as charged in count 4. (Evid. Code, § 1109.) He claims the instruction was in error because L.T. was not a victim of domestic violence in the present case, as defined in Penal Code section 13700, for purposes of Evidence Code section 1109. We agree that the trial court erred in instructing the jury that CALCRIM No. 852A applied to the charge in count 4 relating to L.T. for the reason defendant claims, but we conclude the error was harmless.[5]

---

[5] The People argue defendant has forfeited his claim of error regarding CALCRIM No. 852A because his counsel stipulated to the instruction as given. The People also urge this court not to exercise its discretion to consider the claim, on the ground that the error, if any, did not affect defendant's substantial rights (§ 1259), because it did not prejudice the guilty verdict in count 4—defendant's only conviction involving L.T. Defendant counters that, if his claim is forfeited, then his defense counsel rendered ineffective assistance in stipulating to CALCRIM No. 852A as given. We exercise our discretion to consider defendant's claim, despite his counsel's stipulation to CALCRIM No. 852A as given. (§ 1259; see *People v. Campbell* (2020) 51 Cal.App.5th 463, 495.)

1. <u>Relevant Background</u>

The trial evidence showed that L.T. was a longtime friend of J.L. who "end[ed] up living" in J.J.'s home, for several weeks during the summer of 2019, with J.J., defendant, and their children, J.L. and A.J. The parties stipulated that defendant had three prior convictions "involv[ing] domestic violence," namely, a 2011 criminal threats conviction (§ 422) and 1995 convictions for assault (former § 245, subd. (a)(1)) and vandalism (§ 594). No evidence was admitted concerning the facts or circumstances underlying these prior convictions.

The prosecutor initially proffered a modified version of CALCRIM No. 852A (evidence of uncharged domestic violence), that did not include the two charges in which L.T. was the alleged victim, count 4 (criminal threats) and count 6 (false imprisonment), because, the prosecutor said, L.T. was "not considered a domestic violence victim like the other ones." The court responded, "I'm not sure that you need to do that. I think the case law says propensity for violence. But if both of you stipulate, that will be fine." The parties then stipulated that the court could include all of the charges, in counts 1 through 8, in giving CALCRIM No. 852A. The jury was later instructed, pursuant to CALCRIM No. 852A, as follows:

"Evidence of uncharged domestic violence: The People presented evidence that the defendant committed domestic violence that was not charged in this case, specifically a prior felony conviction from 2011 for Penal Code section 422, criminal threats, and a prior conviction from 1995 for [Penal Code section] 245, assault, and a prior conviction from 1995 for Penal Code section 594, vandalism.

14

"Domestic violence means abuse committed against an adult who is a spouse or former spouse, or a person with whom the defendant has a child. Domestic violence can also include abuse committed against a child of the defendant or any family member.

"Abuse means intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable fear of imminent serious bodily injury to himself or herself or to . . . someone else.

"The People and the defense stipulated that the defendant has these three prior convictions for uncharged domestic violence incidences from 2011 and two from 1995. This stipulation means the prior uncharged domestic violence incidents were proven beyond a reasonable doubt.

"If you decide that the defendant committed the uncharged domestic violence, you may but are not required to conclude from that evidence that the defendant was disposed or inclined to commit domestic violence, *and based on that decision also conclude that the defendant was likely to commit the crimes charged in Counts 1 through 8* or the lesser included offenses. The People must still prove the charges beyond a reasonable doubt." (Italics added.)

2. Applicable Legal Principles and Analysis

We review claims of instructional error de novo. (*People v. Fiore* (2014) 227 Cal.App.4th 1362, 1378.) CALCRIM No. 852A was given pursuant to Evidence Code section 1109, which provides, subject to exceptions not relevant here, that, "in a criminal action *in which the defendant is accused of an offense involving domestic violence*, evidence of the defendant's commission of other domestic violence is not made

15

inadmissible by Section 1101[6] if the evidence is not inadmissible pursuant to Section 352."[7] (Evid. Code, § 1109, subd. (a), italics added.) For purposes of Evidence Code section 1109, and as relevant here, "domestic violence" has the meaning set forth in Penal Code section 13700. (Evid. Code, § 1109, subd. (d)(3).)

Penal Code section 13700 defines "domestic violence" as "abuse committed against an adult or a minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the suspect has had a child or is having or has had a dating or engagement relationship. . . ." (Pen. Code, § 13700, subd. (b).) "Abuse" is defined as "intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another." (*Id*. at subd. a).) As given, CALCRIM No. 852A included these definitions of domestic violence and abuse.

Because L.T. did not have a relationship with defendant described in Penal Code section 13700, subdivision (b), L.T. is not a person against whom defendant could have committed "domestic violence" in this case. That is, the charged crimes against L.T., including the criminal threats charge in count 4, were not crimes *of* domestic violence.

---

[6] Subject to exceptions, including the exception set forth in Evidence Code section 1109, Evidence Code section 1101, subdivision (a), provides that, "evidence of a person's character or trait of his or her character," including evidence of "specific instances" of the person's "conduct," "is inadmissible when offered to prove [the defendant's] conduct on a specified occasion."

[7] Defendant does not claim that the evidence of his 1995 and 2011 convictions involving domestic violence was inadmissible pursuant to Evidence Code section 352.

(Pen. Code, § 13700, subds. (a), (b).)[8]  Moreover, and more to the point, the criminal threats charge against L.T. in count 4 did not "involve domestic violence" within the meaning of Evidence Code section 1109.  (Cf. *People v. Megown* (2018) 28 Cal.App.5th 157, 165 (*Megown*).)

*Megown* is both instructive and distinguishable.  There, the defendant was charged with crimes involving domestic violence against Michelle, the mother of his child, and with whom he cohabitated and had a dating relationship.  (*Megown*, *supra*, 28 Cal.App.5th at pp. 159-160; § 13700, subd. (b).)  In the same case, the defendant was charged with committing offenses against Michelle's mother, Maria, including assaulting Maria with a firearm.  (*Megown*, at p. 166.)

The evidence showed that, following a violent incident in which the defendant pointed a gun at Michelle and threatened to kill her, Michelle called Maria, and Maria came to Michelle's and the defendant's home.  Defendant then pointed a gun at both Michelle and Maria, and threatened to kill both of them.  (*Megown*, *supra*, 28 Cal.App.5th at pp. 161-162.)  The prosecution presented evidence, pursuant to

---

**8**  For purposes of Evidence Code section 1109, "domestic violence . . . has the further meaning as set forth in Section 6211 of the Family Code," but this further meaning only applies "*if the act occurred no more than five years before the charged offense*."  (Evid. Code, § 1109, subd. (d)(3), italics added.)  Family Code section 6211 does not apply here because the acts underlying defendant's 1995 and 2011 convictions must have occurred more than five years before any of the charged crimes in counts 1 through 8 occurred on July 25, 2019.  Family Code section 6211 defines "domestic violence" as "abuse" perpetrated against persons with specified relationships to the defendant, including, "any . . . person related [to the defendant] by consanguinity or affinity within the second degree."  (Fam. Code, § 6211, subd. (f).)  Thus, if Family Code section 6211 applied, defendant's children, J.L. and A.J., would be victims of defendant's domestic violence in counts 3, 5, and 8.  As it is, however, they are not.

Evidence Code sections 1109, that the defendant committed uncharged prior acts of domestic violence against Michelle, to prove that defendant had a propensity to commit, or was likely to have committed, the charged offenses against both Michele and Maria. (*Id.* at pp. 162-163.)

On appeal, the defendant claimed the trial court abused its discretion in admitting the evidence of his prior acts of domestic violence against Michelle "to prove his crimes against Maria because Maria [was] not within the class of persons to whom section 1109 applies." (*Megown*, *supra*, 28 Cal.App.5th at p. 166.) *Megown* rejected the claim, noting that the claim "ignored" the language of section 1109, which allows the introduction of prior domestic violence crimes evidence, " 'in a criminal action in which the defendant is accused of an offense *involving* domestic violence . . . .' ([Evid. Code,] § 1109, subd. (a), italics added.)" (*Ibid.*) *Megown* reasoned: "Being 'accused of an offense involving domestic violence' is broader than domestic violence which is defined as abuse committed against one of certain defined individuals. To 'involve' means 'to include, contain, or comprehend within itself or its scope.' " (*Ibid.*)

*Megown* concluded it was not error to admit the evidence of the defendant's prior acts of domestic violence against Michelle, as propensity evidence to prove that the defendant was likely to have committed the crimes against Maria (Evid. Code, § 1109) because the charged crimes against Maria took place in Michelle's presence, under circumstances which made Michelle "reasonably apprehensive about imminent injury to Maria." (*Megown*, *supra*, 28 Cal.App.5th at p. 166; Pen. Code, § 11370, subd. (a) [defining "abuse" for purposes of "domestic violence" as including "placing another

18

person in reasonable apprehension of imminent serious bodily injury to himself or herself, *or another*" (italics added)].) *Megown* held: "Because Megown's crimes against Maria took place in Michelle's presence, the crimes against Maria '*involved* domestic violence.' " (*Megown*, at p. 166.)

Here, in contrast to *Megown*, defendant's criminal threats against L.T., as charged in count 4, did not take place in J.J.'s presence, or in the presence of any other person who had a relationship with defendant described in Penal Code section 13700, subdivision (b).)[9] Instead, the criminal threats against L.T. took place in J.J.'s car, after defendant left J.J. on the side of the road. Simply put, defendant's criminal threats against L.T. did not cause anyone, who had a relationship with defendant described in Penal Code section 13700, subdivision (b), to be "in reasonable apprehension of imminent serious bodily injury to himself or herself, or another." (Pen. Code, § 13700, subd. (a).) Thus, the criminal threats charge in count 4 did not "involve" domestic violence, within the meaning of Evidence Code section 1109, subdivision (a).

The People argue that *Megown*'s reasoning applies here because *all of the charged crimes*, including the criminal threats charge against L.T. in count 4, "arose out of an argument that began with [defendant] and his ex-wife [J.J.]" The People point out that, like the victim Michelle's mother, Maria, in *Megown*, "crimes of domestic violence took place in front of [L.T.] and were committed against him at the same time. In other words, the criminal threat against [L.T.] involved crimes of domestic violence." This argument

---

**9** See footnote 7, *ante*. Neither J.L. nor A.J. are persons described in section 13700, subdivision (b).

19

is unsound because it disregards the definitions of "domestic violence" and "abuse" in Penal Code section 13700, which are controlling here in interpreting the phrase, "involving domestic violence," in Evidence Code section 1109, subdivision (a).

The error in CALCRIM No. 852A was harmless, however. "Error in admitting evidence of a defendant's prior acts of domestic violence under section[] 1109 . . . is subject to the standard of prejudice set forth in *People v. Watson* (1956) 46 Cal.2d 818." (*Megown*, *supra*, 28 Cal.App.5th at p. 167; *People v. Ogle* (2010) 185 Cal.App.4th 1138, 1145.) Under the *Watson* standard, an error is prejudicial only if the defendant shows "it is reasonably probable that a result more favorable to the [defendant] would have been reached in the absence of the error." (*People v. Watson* (1956) 42 Cal.2d 818, 836.)

Defendant has not made this showing. To the contrary, the evidence that defendant made criminal threats against L.T. by threatening to kill him and everyone else who was in J.J.'s car while he was driving it was very strong. The was evidence described in detail in our discussion of defendant's substantial evidence challenge to his conviction in count 4. Based on that evidence, we discern no reasonable probability that the error in instructing the jury that it could consider the evidence of defendant's 1995 and 2011 prior convictions in determining whether it was likely that defendant committed the criminal threats charge against L.T. in count 4 (CALCRIM No. 852A), affected the verdict in count 4.

20

C. *Substantial Evidence Supports Defendant's Conviction in Count 8 for Misdemeanor Child Abuse of A.J. (§ 273a, subd. (b))*

Defendant claims insufficient evidence supports his conviction in count 8 for the misdemeanor child abuse of A.J. (§ 273a, subd. (b).) We find no merit to this claim. Section 273a, subdivision (b), defines the offense of misdemeanor child abuse: "Any person who, under circumstances or conditions other than those likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health may be endangered, is guilty of a misdemeanor."

The jury was instructed on misdemeanor child abuse pursuant to CALCRIM No. 823. The instruction told the jury that, in order to prove the charge in count 8, the People had to prove two elements: "1. The defendant, while having care or custody of a child, willfully caused or permitted the child to be placed in a situation where the child's person or health was endangered; [¶] AND [¶] 2. The defendant was criminally negligent when he caused or permitted the child to be endangered." (CALCRIM No. 823.)

The instruction also stated: "Unjustified physical pain or mental suffering is pain or suffering that is not reasonably necessary or is excessive under the circumstances. [¶] Criminal negligence involves more than ordinary carelessness, inattention, or mistake in judgment. A person acts with criminal negligence when: [¶] 1. He or she acts in a reckless way that is a gross departure from the way an ordinarily careful person would act

21

in the same situation; [¶] 2. The person's acts amount to disregard for human life or indifference to the consequences of his or her acts; [¶] AND [¶] 3. A reasonable person would have known that acting in that way would naturally and probably result in harm to others." (CALCRIM No. 823)

As we have stated, in reviewing a claim that insufficient evidence supports a criminal conviction, our task is to review the entire record in the light most favorable to the judgment, in order to determine whether the record contains substantial evidence— evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could have found the defendant guilty of the crime beyond a reasonable doubt. (*Johnson*, *supra*, 26 Cal.3d at p. 578.)

Defendant argues that his " 'erratic' " driving of J.J.'s car while A.J. was in the backseat with J.L. and L.T. was insufficient to show that he was criminally negligent and committed misdemeanor child abuse of A.J. He claims "the worst that can be said, as stated by [L.T.], was that [he, defendant] was driving fast and somehow erratically." Defendant's argument disregards the evidence as a whole. And, as the People point out, misdemeanor child abuse "can be committed by a continuous course of conduct and need not be based on specific acts." (*People v. Sheffield* (1985) 168 Cal.App.3d 158, 167.)

The evidence showed that A.J. was around age 12 on July 25, 2019, had Down syndrome, and was autistic and nonverbal. A.J. was riding in the backseat of J.J.'s car when J.J. and defendant were yelling at each other and defendant was hitting J.J. in the back of the head. Defendant then pulled J.J. out of the car, threw her in a ditch, left her on the side of the road, and drove away in her car, with A.J., J.L., and L.T. still in the

22

backseat. Defendant was driving "erratic[ally]" and repeatedly threatened to kill everyone who was still in the car, including A.J. L.T. testified that, when defendant was making his threats, he, L.T., did not have a chance to look at A.J., and he did not hear whether she was crying. But when defendant pulled into the gas station and told everyone to get out of the car, L.T. saw that A.J. looked "confus[ed] and uncertain[]," which was unusual for A.J. And, after defendant drove to J.J.'s house, J.L. "console[d]" A.J.

Based on this evidence, the jury reasonably could have concluded that defendant willfully placed A.J. in a situation in which her person or health was endangered, acted with criminal negligence and, in doing so, inflicted unjustified mental suffering on A.J. Indeed, defendant's conduct was "reckless in a way that is a gross departure from the way an ordinarily careful person would act in the same situation," "amount[ed] to disregard for human life or indifference to the consequences of his . . . acts," and "a reasonable person would have known that acting in that way would naturally and probably result in harm to others." (CALCRIM No. 823.)

## IV.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS                        
                        J.

We concur:

RAMIREZ                        
              P. J.

MENETREZ                       
          J.