Filed 3/7/25

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> SAMUEL SCOTT COPELAND, <br><br> Defendant and Appellant. | D083131 <br><br><br><br><br> (Super. Ct. No. SCN433771) |

APPEAL from a judgment of the Superior Court of San Diego County, Laura E. Duffy, Judge. Reversed.

Laura Arnold, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Christine Y. Friedman and Eric A. Swenson, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Samuel Scott Copeland of one count of knowingly and maliciously attempting to prevent or dissuade a witness from giving testimony, in violation of Penal Code[1] section 136.1, subdivision (a)(2), based on allegations that he withheld rent to pressure his friend and landlord, Madelyn Wagner, from testifying in a civil dispute that arose between him

---

[1] Further unspecified statutory references are to the Penal Code.

and their mutual friend, Trina West.  The trial court declined to reduce the charge to a misdemeanor, sentenced Copeland to two years formal probation, and imposed but stayed a sentence of 365 days in custody, pending successful completion of probation.

Copeland argues the conviction must be overturned for three reasons: 1) substantial evidence does not support a finding that Wagner was a "witness" within the meaning of section 136, subdivision (2) at the time he made the allegedly intimidating statements; 2) the instruction given to the jury misstated the law by improperly expanding the definition of the term "witness"; and 3) as applied here, the instant prosecution under section 136.1, subdivision (a)(2) violates his first amendment right to free speech.  In addressing these assertions, we conclude the term "witness" as defined in section 136, subdivision (2) is not so broad as to include potential future witnesses to a civil dispute, and, therefore, there was not substantial evidence Wagner was a "witness" as used in the statute of conviction.  We also conclude that the model instruction given to the jury misstated the law in a prejudicial manner.  We therefore reverse the judgment.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

The alleged witness, Wagner, owns two horse properties in north San Diego county.  The properties are side-by-side, in viewing distance of one another.  Wagner lives on one of the properties and has four horses that she keeps there.

In October 2011, Wagner began leasing the adjacent property to Copeland.  Wagner charged Copeland $1,500 per month at first, and later increased the rent to $1,650 per month.  Rent was due on the 15th of the month.  For nearly 10 years, from October 2011 through June 2021, Copeland paid his rent each month in a timely manner.

2

Copeland and Wagner grew to be close friends. Copeland referred to Wagner as family and had dinner at her house once a week. Wagner was also close friends with West and had been for approximately 20 years. West owned a pony named Cooper that she purchased in 2008, as part of a pony ride business that she operated with her daughters. West closed the business in 2015. Her daughters were grown, and no one was riding Cooper anymore, so West was open to the idea of someone else taking care of him.

Wagner knew that Copeland wanted horses and suggested to West that Copeland might be interested in a feed lease[2] for Cooper. West knew that Copeland took good care of his animals and Wagner told her that Copeland had a goddaughter who would be a good fit for Cooper. West was fond of Cooper and took comfort in the fact that Wagner lived right next door to Copeland and could inform her of any issues with Cooper's care. Wagner was training a horse for West, and Copeland would often join West to watch the training. West and Copeland discussed the lease over the course of several of these training sessions. Wagner took part in at least some of the conversations but would not have known if Copeland and West talked more about the lease outside her presence.

Copeland started caring for Cooper, on the property he leased from Wagner, under a feed lease in June of 2016.[3] Cooper was approximately 15 years old. West never suggested that she intended to sell Cooper to

_____

[2] A feed lease is an agreement by which an individual agrees to take responsibility for the care of a horse in exchange for use of the horse, but no money is exchanged, and the owner maintains title.

[3] Copeland has always asserted that he "adopted" Cooper, but in the context of a sufficiency of the evidence claim, we construe the facts in the light most favorable to the judgment. (*People v. Houston* (2012) 54 Cal.4th 1186, 1215 (*Houston*).)

Copeland, and she did not give Copeland any title documents. West estimated that Cooper was worth about $5,000, but she did not make any attempt to ascertain his value. Wagner sold Copeland two other horses, and he acquired a third, bringing the total number of horses in his care on the property, including Cooper, to four.

When Wagner's property insurance renewed in 2020, the agent told Wagner that Copeland could have the four horses he had on the property, but her insurance rate would go up and he could not have any more horses on the property. Wagner asked Copeland to meet with the agent. The agent explained this all to Copeland and told Copeland that he would also need to carry a separate insurance policy. As far as Wagner knew, Copeland did not obtain that separate policy.

In early 2021, Copeland told Wagner that he wanted a fifth horse. Wagner reminded him the property insurance only allowed for four horses, so he would not be able to have the fifth. Copeland was upset, but also had not gotten additional renters' insurance as recommended by Wagner's agent, and the situation put a strain on their relationship. Copeland suggested that he could return Cooper to West to make space for the new horse. He said that he would call West but did not do so immediately. West did eventually find out about the situation but could not recall who first told her or when. Around the same time, West learned that another friend was looking for a pony for her granddaughter. She thought it might be a good fit, since Copeland was trying to move Cooper.

On June 6, 2021, West sent a text message to Copeland about moving Cooper. Copeland was immediately defensive and argumentative. He said that West had told him she would not just take Cooper away and begged West to let him keep Cooper. At some point in the conversation, Copeland

4

expressly refused to return Cooper. A few hours later, West contacted the sheriff's department and requested an escort to pick Cooper up from Copeland's leased property. Copeland was not home when the sheriff's deputy arrived. The deputy reached out to Copeland and Copeland said that neither the deputy nor West had permission to enter his property. At that point, the deputy told West that he believed it was a civil matter.

That same day, June 6, 2021, West told Copeland that she was going to file a civil lawsuit over Cooper. She told Wagner that she would be a witness in the lawsuit, and that she would subpoena her if necessary. Wagner told West that she would testify without a subpoena. West consulted an attorney but determined she could not afford the retainer. She did not believe Copeland would ever give Cooper away, so she decided to hold off on the lawsuit and see if there was any other way to get Cooper back.

About a week later, starting on June 14, 2021, Copeland exchanged a series of text messages with Wagner. Copeland stated, "I suggest you get [West] off my back. I can't afford to pay rent and my lawyer this month, plus I bought a car before this debacle."

On June 16, 2021, Copeland texted Wagner again and stated, in relevant part: "Morning, I haven't been served yet and if I'm not going to be I can pay the rent. I don't need a lawyer in small claims court but I would pay my lawyer to advise me so I can hopefully win . . . . If I go to court it will probably cost me about $5000 but I would pay 10 not to upset [my goddaughter]. It must be confusing that I bought a very expensive car but it is all on credit." After relaying a story about when they first met, Copeland ended with, "I miss our friendship[.] I hope it resumes someday."

The next day, June 17, Copeland texted Wagner: "Hopefully I won't get notice[.] [I]f I get served and my loan doesn't come through and I can't

5

pay for three months!  Why don't you call [West] like you said you would and tell her to back off[.]  I guarantee you she will listen to you[.] :-)"  In another text that same day, Copeland stated:  "If worse comes to worse I'll just go to court[.]  [E]very expert I've talk [*sic*] to said I have nothing to worry about with all the proof I have, but I hope you are not there with her because that would contradict you staying out of the middle for sure. . . .  I'm sorry about the delays in rent due to this!"  Copeland had not yet paid his rent for June, which was due two days earlier on the 15th.

Wagner told Copeland that West had already said she would subpoena her, and that she had their correspondence in writing.  Copeland responded, "You don't have to go."  Wagner said that she would go if she received a subpoena and Copeland responded, "There's 1 million ways out. . . .  In that case I will subpoena you to testify that you were not there during the negotiation."  Wagner said that he would not have to subpoena her and that she had always said she was not there for the negotiations.  Copeland then stated, "Your biggest reason is that you don't want to get in the middle because they are both your friends[.]  I suggest[,] strongly suggest you do not go . . . .  No court in the world would require a witness to appear between two best friends."

The prosecution did not present any further text messages or communications between Copeland and Wagner regarding the potential litigation over Cooper.

Copeland did not pay rent to Wagner from June 2021 through January 2022.  (Meanwhile, West still had not filed any civil action against Copeland.)  Wagner filed a three day notice to pay or quit in January 2022.  Copeland paid Wagner $6,600 in back rent in response.  Copeland said the funds came from Covid-19 relief payments, and Wagner confirmed that she

6

was aware that was the source of the funds. Copeland testified that his business was impacted by the pandemic, and he was struggling to keep his business afloat and pay his bills. Copeland did not pay any additional rent after the January 2022 payment. In July 2022, Copeland and Wagner, each represented by their own attorneys, entered an agreement that Copeland would vacate the premises by August 31, 2022, and that all outstanding rent would be deemed satisfied.

In February 2022, after Copeland had paid Wagner the $6,600 in back rent, but before he and Wagner agreed that he would vacate the property, Copeland ran an advertisement in the Horse Trader offering to sell Cooper for $5,000. Not long after, Wagner called West and told her that Cooper was no longer at the property Copeland was renting.[4] West filed a complaint against Copeland in small claims court on March 21, 2022 (the civil case).

As best we can ascertain from the record, West also contacted law enforcement shortly after Cooper disappeared. San Diego County Sheriff's deputies arrested Copeland on April 12, 2022, for grand theft of a horse in violation of section 487, subdivision (a), and attempting to prevent or dissuade a witness from testifying in violation of section 136.1, subdivision (a)(2). Copeland was arraigned on May 27, 2022, on a single count of violating section 136.1, subdivision (a)(2), and pled not guilty. It is not apparent from the record before us why the People did not also charge Copeland with theft.

The court held a hearing in the civil matter on August 18, 2022, after Copeland's arrest. Wagner is listed as a witness for West on the minute

---

[4]     Copeland confirmed on cross-examination that Cooper was released to someone that responded to the advertisement, and that he did receive $5,000.

7

order from the hearing. The order indicates Copeland sought a continuance pending resolution of the criminal case. Wagner never received a subpoena but was always willing to testify in the civil case.

The trial court held a preliminary hearing in the criminal case in November 2022. At the outset, defense counsel noted: "There has been a civil suit filed, but the reason why we're here at [the preliminary hearing], actually, the district attorney's office has offered my client a full dismissal in this case contingent upon him giving back the pony and he just won't do that." At the conclusion of the hearing, Copeland moved to dismiss the case and asserted the People had not met their burden. The trial court found there was sufficient evidence to establish Copeland knew there would be a civil lawsuit and that it was "likely" that Wagner would be called as witness. Relying on "the CALCRIM instruction," the trial court found there was a sufficient basis to bind Copeland over.

Copeland then filed a motion to dismiss the information pursuant to section 995. He asserted the definition of "witness" was limited in a civil context and did not encompass the charges in this case. The trial court denied the motion and the criminal case proceeded to trial in September 2023. After hearing testimony from Wagner, West, and Copeland, the jury found Copeland guilty on one count of attempting to prevent or dissuade a witness from testifying in violation of section 136.1, subdivision (a)(2). The trial court sentenced Copeland to two years of formal probation and ordered him to pay restitution to Wagner in the amount of $18,150 for the rent that he did not pay while living on her property, plus an additional $3,000 for attorney fees.

Copeland filed a timely notice of appeal.

## II.    DISCUSSION

8

Copeland asserts substantial evidence does not support the conviction because Wagner was not a "witness" as defined by section 136, subdivision (2); the jury instruction misstated the law when it defined "witness" as used in the statute; and, as applied to him in this case, the prosecution under section 136.1, subdivision (a)(2) violates his first amendment right to free speech.

## A.    Substantial Evidence Does Not Support the Conviction

"It is the prosecution's burden in a criminal case to prove every element of a crime beyond a reasonable doubt." (*People v. Cuevas* (1995) 12 Cal.4th 252, 260.) " 'In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " (*Houston, supra,* 54 Cal.4th at p. 1215.) " 'We do not reweigh evidence or reevaluate a witness's credibility,' " and " 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*Ibid*.)

Here, the People asserted one count of attempting to prevent or dissuade a witness from testifying in violation of section 136.1, subdivision (a)(2), which states: "(a) Except as provided in subdivision (c), any person who does any of the following is guilty of a public offense and shall be punished by imprisonment in a county jail for not more than one year or in the state prison: [¶] . . . [¶]  (2) Knowingly and maliciously attempts to prevent or dissuade any witness or victim from attending or giving testimony at any trial, proceeding, or inquiry authorized by law."

9

The prosecution's theory was that Copeland knowingly and maliciously attempted to dissuade Wagner from testifying in the civil case by threatening to withhold and withholding rent. Copeland does not dispute that he sent text messages to Wagner in June 2021 stating that he could not afford to pay rent if West sued, and that he did not pay rent thereafter. But he contends the prosecution did not present substantial evidence that Wagner was a "witness" when he sent the text messages.

The term "witness" as used in section 136.1 is defined in section 136, subdivision (2) to include: "any natural person, (i) having knowledge of the existence or nonexistence of facts relating to any crime, or (ii) whose declaration under oath is received or has been received as evidence for any purpose, or (iii) who has reported any crime to any peace officer, prosecutor, probation or parole officer, correctional officer or judicial officer, or (iv) who has been served with a subpoena issued under the authority of any court in the state, or of any other state or of the United States, or (v) who would be believed by any reasonable person to be an individual described in subparagraphs (i) to (iv), inclusive."

The People do not allege that Wagner had knowledge of any fact relating to a crime or that she reported a crime. Further, they acknowledge that at the time Copeland sent the allegedly intimidating text messages, West had not filed the civil suit against Copeland; Wagner had not been subpoenaed; and Wagner had not given any declaration under oath. They rely exclusively on the definition of "witness", as set forth in section 136, subsection (2)(v) and assert there was evidence that any reasonable person would believe that Wagner *would* be subpoenaed or *would* give a declaration under oath in a civil matter at some point in the future and therefore she was a "witness" for purposes of section 136.1, subdivision (a)(2).

10

Whether the definition of witness in section 136 includes a prospective witness in a yet-to-be-filed civil suit, as the People assert, is a question of law that we review de novo, under well-settled standards of statutory interpretation. (*People v. Lewis* (2021) 11 Cal.5th 952, 961; *People v. Schulz* (2021) 66 Cal.App.5th 887, 893.) Our fundamental task is to determine the Legislature's intent and effectuate the law's purpose. (*Lewis,* at p. 961.) We begin with the language of the statute itself. (*Ibid*.) We give the words their plain and commonsense meaning, while also considering the context and framework of the entire statutory scheme and keeping in mind its nature and purpose. (*Ibid*.)

"If the words in the statute do not, by themselves, provide a reliable indicator of legislative intent, '[s]tatutory ambiguities often may be resolved by examining the context in which the language appears and adopting the construction which best serves to harmonize the statute internally and with related statutes.' " (*People v. Gonzalez* (2008) 43 Cal.4th 1118, 1126.) We may also "consider a variety of extrinsic aids, including legislative history, the statute's purpose, and public policy." (*Ibid*.)

We begin with the language of the statute at the center of the issue; section 136, subdivision (2)(v). Replacing the words "an individual described in subparagraphs (i) to (iv)," with the language of subdivisions (ii) and (iv)—the only two subdivisions that are potentially relevant in the context of a civil dispute—the plain language of section 136, subdivision (2)(v) defines the term "witness" to include: "any natural person, . . . (v) who would be believed by any reasonable person to be an individual" "whose declaration under oath is received or has been received as evidence for any purpose, or . . . who has been served with a subpoena issued under the authority of any court in the state, or of any other state or of the United States." (§ 136,

11

subds. (2)(ii), (iv), & (v).)  Arranging the language of the statute in this way, it is apparent that in the civil context, subdivision (2)(v) does not introduce some prospective, forward-looking definition of "witness."  It simply covers an individual that any reasonable person would believe currently falls into categories (i) through (iv) even if, in reality, they do not.  For example, it would cover an individual a reasonable person would believe had been subpoenaed or submitted a declaration under oath even if they actually had not.

Here, there was no evidence that Copeland believed, or that a reasonable person would believe, that Wagner had been served with a subpoena or that her declaration under oath was or had been received when he sent the June 2021 text messages.  Indeed, for much of the exchange, it appears as though Copeland was trying to get Wagner to persuade West not to file the civil case in the first instance.  Wagner brought up the idea of a subpoena well into the conversation when she said that West "has already stated she *will* [subpoena] me," a clear indication that West had not yet done so.  (Italics added.)  At that point, Copeland said Wagner did not have to go but also suggested that he would subpoena her himself.  Based on this exchange, no reasonable person would believe there was a pending civil suit, or that Wagner had already been subpoenaed or had given a declaration under oath.

Based on this evidence and the instruction to the jury, which we will discuss in more detail *post*, the prosecutor argued "[a]ll that matters is [Copeland] reasonably believed, that if that civil case went forward, [Wagner] *may be* a witness and she *may be giving evidence* in that case— *may,* not *will* be testifying in that case, not *has testified* in that case, *may testify* in that case."  (Italics added.)  We find no support for this theory of

12

guilt, as presented by the prosecution, in the plain language of section 136.1 or the associated definitions set forth in section 136, subdivision (2). There is no forward-looking language in the definition of "witness," even when incorporating the additional "believed by any reasonable person" language of section 136, subdivision (2)(v).

To the extent the plain language of the statute may be considered ambiguous in this regard, both the legislative history and a comparison to the language of other related statutes supports an interpretation of section 136, subdivision (2) that does not include an expansive, forward-looking definition of "witness."

Section 137, subdivision (a), prohibits giving or offering "any witness, *person about to be called as a witness*, or person about to give material information pertaining to a crime to a law enforcement official, any bribe influencing testimony or information given to a law enforcement official." (§ 137, subd. (a), italics added.) Section 137 is in the same chapter as section 136.1 and thus, the same statutory definition of "witness" set forth in section 136 applies. If we were to read the definition of "witness" to include prospective witnesses as the People suggest, the additional language in section 137, subdivision (a) covering any "person about to be called as a witness" would be rendered superfluous. (See *People v. Valencia* (2017) 3 Cal.5th 347, 357 ["we generally must 'accord[ ] significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose,' and have warned that '[a] construction making some words surplusage is to be avoided' "].) This also explains why model jury instruction CALJIC No. 7.03.3 differentiates between "witness" and "person about to be called as a witness." The terms have different meaning, with the latter being significantly broader than the former.

13

And, of course, the words "about to be called as a witness" are notably absent from section 136.1.[5]  Since the Legislature clearly knew how to include prospective witnesses in the language of related statutes, they could have included similar language in section 136.1.  The omission of that language is evidence of the Legislature's intention to exclude persons "about to be called as a witness" from section 136.1.  (See *Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 725 [when the Legislature has carefully employed a term in one place and has excluded it in another, it should not be implied where excluded]; *Craven v. Crout* (1985) 163 Cal.App.3d 779, 783 ["Where a statute referring to one subject contains a critical word or phrase, omission of that word or phrase from a similar statute on the same subject generally shows a different legislative intent"].)

The People argue that in passing the model witness intimidation statute, the Legislature intended to broaden its protection of witnesses.  A review of the legislative history suggests this was true in the criminal context.[6]  However, the record is devoid of any evidence suggesting the same

---

[5]    The People point out that the use note for CALJIC No. 7.03.3 suggests "any bracketed portion can be used to fill out any instruction relating to bribery of *or dissuading a witness*."  (Italics added.)  It does not follow that any statute discussing dissuasion must therefore be susceptible to a "person about to be called as a witness" interpretation.  Rather, this may be a reference to statutes such as section 138 which criminalizes "any offer of a bribe to dissuade any person from attending upon any trial or other judicial proceeding."  (§ 138, subd. (a), italics added.)

[6]    Respondent's unopposed request that we take judicial notice of legislative history materials and a report from the ABA Committee on Victims is hereby granted.  (See Evid. Code §§ 452, 459; Cal. Rules of Court, rule 8.252.)

14

for witnesses in purely civil disputes, and particularly in civil disputes where no action has yet been filed.

The Legislature replaced the prior version of the witness intimidation statute in 1980, "to pattern the California witness intimidation statute from the Model Statute as proposed by the American Bar Association [the ABA]." (See Sen. Com. on Judiciary, Analysis of Assem. Bill No. 2909 (1979-1980 Reg. Sess.) as amended Apr. 9, 1980; see also *People v. Reynoza* (2024) 15 Cal.5th 982, 996 (*Reynoza*) ["Before the Legislature enacted section 136.1, witness dissuasion was prohibited by former section 136"].)  In doing so, the Legislature noted several differences in the model statute, such as changing the necessary "criminal intent from 'willfully and unlawfully' to 'knowingly and maliciously,'" adding a clause criminalizing attempts to prevent or dissuade, and expanding the covered acts to include making a police report, causing an accusatory pleading to be filed, or causing an arrest.  (*Id*. at p. 997.)

The Legislature noted that the previous statute made it unlawful to "prevent or dissuade a witness or potential witness from attending any trial, proceeding or other inquiry authorized by law," and that it would be replaced by "a new intimidation of witnesses and victims law."  (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 2909 (1979–1980 Reg. Sess.), as amended Apr. 9, 1980.)  Thus, we presume the Legislature was aware of the difference in the use of "witness or potential witness" and "witnesses and victims" as defined by the model statute.  The Legislature noted the purpose of the bill was to "expand the coverage of law prohibiting the intimidation of witnesses," but then focused on matters such as the inclusion of attempts, increased penalties for use of threats or personal injury, and the expansion

of covered acts to include dissuading a person from making a police report, causing an accusatory pleading to be filed, or causing an arrest. (*Ibid*.)

Likewise, the ABA report setting forth the model statute focuses almost entirely on intimidation in the criminal, as opposed to civil, context. (See ABA Section of Criminal Justice, Committee on Victims, Reducing Victim/Witness Intimidation: A Package (1979) (ABA Model Report); see also, *Reynoza, supra,* 15 Cal.5th at pp. 996–999 [discussing the Legislature's adoption of the ABA model statute].) In defining "witness," the ABA committee "intended clearly to cover a person who has become aware *of a crime* but who has not yet been subpoenaed." (ABA Model Report, p. 7). They also included the requirement that malice be intentional and knowing because the majority was concerned the statute might otherwise be used to punish "a person casually remarking to a potential witness that he or she should not bother getting involved in the process." (*Ibid*.) Nowhere did the ABA committee or the Legislature mention expanding the statute to criminalize pre-litigation discussions with a potential witness in a yet-to-be-filed civil suit. Rather, it appears at least the ABA committee that drafted the model statute was concerned with unintentionally criminalizing such behavior.

Notably, one of the Legislature's criticisms of the model statute was that "the syntax is cumbersome" and "the drafters found it necessary to define terms such as 'victim' and 'witness' in ways which defy the common sense meaning of the words. For example, 'witness' could be a person who 'has reported any crime to a peace officer' even if such person neither actually witnessed the crime nor would be expected to testify at any judicial proceeding." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 2909 (1979–1980 Reg. Sess.), as amended Apr. 9, 1980.)

16

Based on our reading of the plain language of the statute, the language of related statutes, and the legislative history, we find that in a civil context, the definition of "witness" in section 136 subdivision (2) is limited to those individuals that *have been* subpoenaed or *have given* a declaration under oath, or those that a reasonable person would believe *have been* subpoenaed or *have given* a declaration under oath. While we do not intend to suggest that criminal witness intimidation cannot occur in a civil case, we decline to read section 136, subdivision (2)(v) in a manner that would expand the definition of "witness" to encompass a potential witness in civil litigation that has not yet been filed.

One can think of nearly endless scenarios in which an individual may suggest, discuss or even threaten to file civil litigation, and in each such instance, there could be any number of possible witnesses to some aspect of the dispute. We see nothing in the plain language of the statute or the legislative history to suggest the Legislature intended to criminalize communications with all such potential witnesses in possible, but not-yet-filed civil suits. (Cf. ABA Model Report, p. 7 [reflecting concern that the statute not be used to punish "a person casually remarking to a potential witness that he or she should not bother getting involved in the process"].)

In seeking to expand the statutory definition of "witness," the People assert appellate decisions have suggested it includes "potential" or "prospective" witnesses. None of the cases they rely upon address the issue in the civil context, and none of them address the issue raised in this case. (See, e.g., *People v. Wahidi* (2013) 222 Cal.App.4th 802, 806 [addressing malice in a case involving a "potential witness" to a criminal assault]; *People v. Foster* (2007) 155 Cal.App.4th 331, 335 [addressing statement made to a third party in a criminal case]; *People v. Womack* (1995) 40 Cal.App.4th 926,

928, 931 [discussing difference between dissuading and influencing the testimony of a "prospective witness" in protective custody in a criminal case]; *People v. McDaniel* (1994) 22 Cal.App.4th 278, 281–282, 284 [discussing intent required in context of father's alleged threats to individual reporting theft by juveniles to police].)  In all these cases, a reasonable person would believe that the witness had knowledge of or had reported a crime, and thus to the extent they fell under section 136, subdivision (2)(v), it would be based on knowledge or reporting of a crime, not being subpoenaed or being a possible witness in a civil case.  Although the courts referred to them generally as "potential" or "prospective" witnesses—in the sense that they had not yet testified in court—they were nevertheless well within the plain language of section 136, subdivision (2).

The People also assert that Copeland continued to withhold rent until he vacated the property in August 2022, after West had filed the civil case. There is no dispute, though, that Copeland did make a payment of $6,600 in January 2021, *before* West filed her civil suit.  By then, Wagner had filed an unlawful detainer action and she and Copeland were involved in their own litigation over the overdue rent.  Moreover, by the time of the August 2022 hearing in the civil case, in which Wagner was listed as a witness, Copeland and Wagner had already executed a settlement in the dispute over the lease.

The prosecution did not present any evidence of any communications between Copeland and Wagner after June 2021, or any other evidence suggesting that Copeland's continued withholding of rent was somehow tied to West's civil case or Wagner's intention to testify in that case.  To the contrary, Wagner had made clear that she would testify regardless of Copeland's statements and actions, had already pursued her own legal recourse against Copeland concerning the overdue rent, and had recovered a

18

significant portion of rent owed. Accordingly, we cannot say that there was substantial evidence Copeland's continued failure to pay rent was a knowing and malicious attempt to dissuade Wagner from testifying in the civil case.

In sum, we conclude there was insufficient evidence to support a claim of witness intimidation under section 136.1, subdivision (a)(2), because Wagner was not a "witness" as defined by section 136, subdivision (2)(v) in June 2021 when Copeland sent the text messages to her. To the extent the prosecution intended to rely on Copeland's continued withholding of rent, they did not present evidence he did so with the express intent of knowingly and maliciously dissuading Wagner from testifying in the civil suit. Accordingly, substantial evidence does not support the conviction.

Moreover, as we explain next, the definition of "witness" presented to the jury misstated the law for these same reasons, and the prosecutor's utilization of that instruction in arguments to the jury requires reversal.

## B. The Definition of "Witness" in CALCRIM No. 2622 is Not Consistent With the Plain Language of the Statute

Copeland also contends the model instruction for intimidating a witness, given to the jury in this case, contains a misstatement of law in the definition of witness.[7]

We review assertions of instructional error de novo. (*People v. Waidla* (2000) 22 Cal.4th 690, 733; *People v. Fiore* (2014) 227 Cal.App.4th 1362, 1378.) We evaluate the correctness of jury instructions from the entire

---

[7] The People assert Copeland forfeited this argument by failing to object to the instruction in the trial court. We reject this assertion because, as we explain, the alleged error resulted in an incorrect statement of the law. (*People v. Mason* (2013) 218 Cal.App.4th 818, 823 ["no forfeiture will be found where, as here, the court's instruction was an incorrect statement of the law"].)

charge of the trial court and not from parts of an instruction or a single instruction. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248.)

The People proposed a jury instruction based on CALCRIM No. 2622. Defense counsel submitted. The court instructed the jury as follows:

> "Mr. Copeland is charged in Count One with intimidating a witness in violation of Penal Code section 136.l(a)(2).
>
> "To prove that Mr. Copeland is guilty of this crime, the People must prove that:
>
> "1. Mr. Copeland maliciously tried to prevent or discourage Madelyn Wagner from giving testimony in Ms. West's civil lawsuit.
>
> "2. Madelyn Wagner was a witness;
>
> "AND
>
> "3. Mr. Copeland knew he was trying to prevent or discourage Madelyn Wagner from testifying and intended to do so.
>
> "A person acts *maliciously* when he or she unlawfully intends to annoy, harm, or injure someone else in any way, or intends to interfere in any way with the orderly administration of justice.
>
> "As used here, *witness* means someone, or a person Mr. Copeland reasonably believed to be someone, whose declaration under oath has been or may be received as evidence.
>
> "It is not a defense that Mr. Copeland was not successful in preventing or discouraging the witness.
>
> "It is not a defense that no one was actually physically injured or otherwise intimidated."[8]

8    The complete version of CALCRIM No. 2622 defines the term "witness" as follows:

> "[As used here, *witness* means someone [or a person the defendant reasonably believed to be someone]:

Copeland asserts the phrase "may be" (as used in the paragraph above that defines "witness") appears nowhere in the statutory definition of "witness," and that its inclusion in the jury instruction defining "witness" improperly broadened the definition and misstated the law. We agree. It is not apparent how or why the phrase "may be" was injected into the model jury instruction but for all the reasons we have explained *ante* in part II.A., we conclude the Legislature intended to limit the statutory definition of witness to those categories expressly included in section 136. It did *not* intend to include persons who *may be* a witness to a civil dispute at some point in the future. If it had intended to do so, it had the appropriate language at its disposal, as shown in sections 137 and 138.

Moreover, we conclude that the error was prejudicial and independently requires reversal. As previously noted, in closing argument, the prosecutor emphasized the words "may be" in the instruction, and told the jury, "[a]ll that matters is he reasonably believed, that if that civil case went forward, she may be a witness and she may be giving evidence in that case – may, not will be testifying in that case, not has testified in that case,

---

"<*Give the appropriate bracketed paragraph[s].*>
"[Who knows about the existence or nonexistence of facts relating to a crime(;/.)]
"[OR]
"[Whose declaration under oath has been or may be received as evidence(;/.)]
"[OR]
"[Who has reported a crime to a (peace officer[,]/ [or] prosecutor[,]/ [or] probation or parole officer[,]/ [or] correctional officer[,]/ [or] judicial officer)(;/.)]
"[OR]
"[Who has been served with a subpoena issued under the authority of any state or federal court.].]

may testify in that case." By expanding the definition to include a possible witness in an as-yet non-existing civil action, the instruction misstated the law. The prosecutor's reliance on that misstatement not only permitted, but encouraged, the jury to return a guilty verdict based on actions that occurred *before* the civil case was filed.

The People argue there is "no possibility" that the jury would not have also convicted Copeland based on his withholding of rent *after* West filed the civil action, but the prosecutor's closing argument focused almost exclusively on the text messages and this forward-looking language. Accordingly, we cannot say " 'beyond a reasonable doubt that the error did not contribute to th[e] jury's verdict.' " (*People v. Sek* (2022) 74 Cal.App.5th 657, 668 [applying prejudice standard set forth in *Chapman v. California* (1967) 386 U.S. 18].)

Based on the foregoing, we conclude the definition of "witness" in the instruction given to the jury misstated the law in a prejudicial manner and is therefore an independent basis for reversal.[9]

### III.   DISPOSITION

The judgment is reversed.

---

[9]    Because we conclude the conviction must be reversed, we need not and expressly do not consider Copeland's constitutional argument. (See, e.g., *Department of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd.* (2006) 40 Cal.4th 1, 17, fn. 13 ["we routinely decline to address constitutional questions when it is unnecessary to reach them"].)

                                                            KELETY, J.

WE CONCUR:


McCONNELL, P. J.


HUFFMAN, J.